528 F.Supp. 152 (1981)
Howard T. McDANIEL and Murlean F. McDaniel, his wife, Plaintiffs,
v.
COMPANIA MINERA MAR de CORTES, SOCIEDAD ANONIMO, INCORPORATED, a Texas corporation; Jack D. Myers, an individual; Ernest B. Myers, an individual; Marvin D. Hodges, an individual; and Bennett C. Cook, an individual, Defendants.
No. CIV 78-281PHX-EHC.
United States District Court, D. Arizona.
October 16, 1981.
*153 *154 Frank C. Brophy, Jr., Phoenix, Ariz., for plaintiffs.
Westlyn C. Riggs, Smith, Riggs, Buckley & Farnsworth, Mesa, Ariz., for defendants.

MEMORANDUM OPINION AND ORDER

(FINDINGS OF FACT AND CONCLUSIONS OF LAW)
CARROLL, District Judge.
This matter came on for trial to the Court on March 16, 1981, and presentation of evidence was completed on March 23, 1981. The Court ordered the parties to submit proposed findings of fact and conclusions of law, and a post-trial memorandum addressing the legal issues.
The parties complied with the Court's order by May 1, 1981, and the case has been ready for disposition since that date.

NATURE OF ACTION AND JURISDICTION
This action was brought by plaintiffs as purchasers of stock of defendant Compania Minera Mar de Cortes, Sociedad Anonimo, Incorporated (Compania) for recission and damages claimed to result from alleged violations by defendants of the Securities Act of 1933, 15 U.S.C. § 77a et seq. (Securities *155 Act), the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (Exchange Act) and the Arizona Securities Act, A.R.S., § 44-1801 et seq. (Arizona Act).
The specific federal regulations alleged are (1) registration violations arising under §§ 12 and 15 of the Securities Act, 15 U.S.C. §§ 77l and o, and (2) anti-fraud violations arising under §§ 12(1) and 17(a) of the Securities Act, 15 U.S.C. §§ 77l(1) and 77q(a), and § 10(b), 15 U.S.C. § 78j(b), Rule 10b-5, 17 C.F.R. Part 240.10b-5 (1979) and § 20(a), 15 U.S.C. § 78t(a) of the Exchange Act.
This Court has jurisdiction over the federal claims pursuant to 15 U.S.C. § 77v, § 22 of the Securities Act and 15 U.S.C. § 78aa, § 27 of the Exchange Act. This Court has pendent jurisdiction to determine the state claims arising under the Arizona Act. Robinson v. Penn. Central Co., 484 F.2d 553 (3rd Cir. 1973).

THE PARTIES
Plaintiffs Howard T. and Murlean McDaniel are residents of the State of Arizona. Mr. McDaniel (McDaniel) has a master's degree in accounting and spent approximately 25 years as an employee with the U.S. Army security agency engaged in accounting and computer operations. Following his retirement from government service in 1973, he engaged in the business of constructing residences in the area of Tappahannock, Virginia for several years. He was employed by defendant Compania in May, 1977, and moved to Phoenix, Arizona. McDaniel had no prior experience in mining engineering or metallurgy.
Defendant Compania is a corporation organized under the laws of Texas in 1975. The incorporators were friends or associates of defendants Jack Myers and Marvin Hodges. At all times relevant to this lawsuit, Compania's board of directors included defendants Jack Myers, Hodges, Ernest Myers and Bennett Cook.
Defendant Jack D. Myers (Jack Myers) is a Texas resident. He is a brother of defendant Ernest B. Myers. He served as an officer and a director of defendant Compania.
Defendant Marvin Hodges is a California resident. He has had some previous mining experience, although he does not have a college degree or certification as a mining engineer. In the early 1950s, he allegedly located several mineral deposits in an area approximately 120 miles northwest of Hermosillo, Sonora, Mexico. These properties were known as the Santa Cleotilde, Padre Kino, La Golondrina and San Juan. Although he professed to have expended approximately $1,500,000 in developing these properties prior to 1974, no substantial evidence was produced at trial which would support a finding that such amounts had been available to Hodges or had in fact been invested in the property. Hodges served as an officer and a director of defendant Compania.
Defendant Ernest B. Myers (Ernest Myers), previously an Arizona resident, is presently a resident of Nevada. He served as an officer and director of defendant Compania.
Defendant Bennett C. Cook (Bennett Cook) is a resident of Georgia. He served as an officer and a director of defendant Compania.

OTHER ACTORS
Robert Sobarzo Carranza (Sobarzo) is a Mexican national from Hermosillo, Sonora, Mexico. He associated with Hodges and Compania in the Mexican mining venture. Sobarzo represented that he was the owner and holder of the mining rights to the four mining concessions named above.
Charles Barnes is McDaniel's friend and former Baptist pastor. It was Barnes who first approached McDaniel concerning investment in Compania. McDaniel later transferred a portion of the Compania stock he acquired to Barnes for no remuneration. Although Barnes was an officer and director of both Compania and American Metalrock Corporation, he was never named as a defendant in this action.
Warren Zimmerman, a Dallas, Texas attorney, represented Compania and earlier *156 corporations organized by one or more of the defendants in pursuit of their mining venture. He also prepared certain stock agreements involving plaintiff and Jack Myers.
American Metalrock Corporation (AMR), a Texas corporation, was organized in 1974. Original incorporators were Hodges, Jack Myers, Ernest Myers and Gibea Richey. AMR was intended to be involved in financing and equipping the proposed Mexican mining venture and to hold the allowed foreign interest in such properties.
Tennessee Metalrock Corporation (TMR) was incorporated in Tennessee in 1974. Ernest Myers was an incorporator and president until he resigned in June, 1976, to become president and chairman of the Board of Compania. TMR raised funds which were invested in AMR and later Compania.
Padre Kino, S.A. de C.V., a Mexican corporation (Padre Kino), was formed to hold any permitted interest in mining rights and property in Mexico. Compania owned approximately a 40% interest in Padre Kino.
Royce Latimer is a purported mining engineer, who prepared a preliminary geologic survey report regarding the Mexican mining properties and which was used in promoting the sale of limited partnership interests by TMR, the general partner.[1] Each limited partnership sold by TMR ($2,500) was represented as having an ownership of one percent (1%) of the common stock of Compania. TMR ultimately sold over 400 of these limited partnership interests as an allegedly private offering to knowledgeable and sophisticated investors.

WHAT OCCURRED
In the early 1950s, Hodges began the "development" of the Mexican mining properties. Jack Myers worked with him from time to time on the project.
In early 1974, AMR was formed to secure additional financing for the mining operations and to hold "title" to personal property and mineral interests as permitted by Mexican laws. The record is unclear regarding the nature and extent of the interest held by AMR in the Mexican mining properties. The testimony was that on January 9, 1970, Sorbarzo conveyed to Hodges his leasehold interest in the Santa Cleotilde and other existing claims. Such conveyance notwithstanding, there was further testimony that on February 5, 1974, Sorbarzo conveyed to AMR 49% of his right, title and interest in the four mining concessions. Whatever the implications of such ambiguities, for purposes of this opinion they need not be resolved.
In March of 1974, Ernest Myers and other persons active in the Southern Baptist Convention organized and incorporated TMR in Tennessee. Thereafter, TMR raised approximately $400,000 in 1974, which was then used by AMR to purchase equipment intended for use at the Mexican mine.
Additional capital was considered necessary to develop and operate the mining properties and as a part of this program, Jack Myers and Hodges arranged for Compania to be incorporated in Texas in November of 1975. Jack Myers and Hodges were named officers and directors of Compania. Ernest Myers and Bennett Cook became directors at a later date, with Ernest Myers becoming President and Cook a Vice-President. At the time of Compania's incorporation, Jack Myers, Hodges, Ernest Myers and Bennett Cook were 4 of the 5 shareholders in AMR.
On January 26, 1976, the Compania Board adopted a resolution authorizing the corporation to raise $1,500,000 "for exploitation and mining activities of the corporation's Santa Cleotilde Mine in the State of Sonora, Mexico," in which Compania represented it held a 49% ownership interest.
In April, 1976, the Compania Board adopted a further resolution to raise 1,500,000 through the sale of stock to TMR, as a general partner for various limited partnerships *157 to be sold by TMR. Under this arrangement, the Compania stock would have been owned by the three entities in the following manner:
1. AMR would hold 1,713,000 shares of Compania common stock;[2]
2. TMR would hold 333,000 shares of Compania common stock; and
3. TMR-Limited Partnerships would equal 1,512,000 shares of Compania common stock.
The resulting total of issued and outstanding Compania common stock therefore, was 3,558,000 shares.
TMR, with the active participation of Compania, prepared and distributed material with respect to the offering of the TMR limited partnerships. These materials were drafted by Zimmerman based upon information furnished by Hodges and Jack Myers. It became necessary for TMR to make a recission offer with respect to the first limited partnership offering, and some of these interests were tendered back and redeemed.
A "Private Placement Memorandum" regarding the TMR interests was printed and distributed after November, 1976. The fund raising venture was to be a private offering of such limited partnership interests to knowledgeable and sophisticated investors "financially affluent to the degree that they are able to make intelligent decisions and can afford to make this financial participation without seriously affecting their general way of life." More than 400 individuals purchased one or more limited partnership units in this so called "private placement". Defendants offered no evidence that such individuals were "sophisticated investors".
The Private Placement Memorandum and the earlier multilith prospectus included representations regarding:
1. claimed past activities of TMR in the mining venture;
2. stock ownership;
3. property interest in the Mexican mining claims and amounts claimed to have been expended in the exploration and development of such interests.
4. the geologic nature of the mining properties and quantities of ore claimed to be available by "harvesting" through relatively easy mining methods; and
5. cash flow projections.
Many of these representations were inaccurate or made without any substantive basis for the assertions.
In April, 1977, Barnes contacted McDaniel to discuss investment in the Mexican mining venture with him. Barnes was then a director of Compania. McDaniel was shown TMR's Private Placement Memorandum. Barnes did not offer to sell TMR limited partnerships to McDaniel and McDaniel was not interested in purchasing such interests in any event. Rather, McDaniel was interested in acquiring a direct ownership interest in Compania at a more favorable price than offered the TMR investors.
Barnes informed McDaniel that he was authorized to sell 72,000 shares of the Compania stock owned by Jack Myers for $100,000. The Jack Myers-Barnes agreement was that Barnes would receive one share free for each share he sold. Barnes later offered to split any shares he received from Jack Myers with McDaniel if McDaniel purchased *158 shares and helped sell the balance of Jack Myers' shares which Barnes was authorized to sell.
It was at this time that Barnes also told McDaniel of a possible job opening with Compania. McDaniel was told that Ernest Myers was looking for someone to handle the company's business affairs. Barnes and McDaniel traveled to Phoenix together and met with Ernest Myers. The two then went to view the mining properties in Sonora, Mexico. McDaniel met and talked with Hodges, Jack Myers and Sobarzo on this occasion.
Following the trip to Arizona, Jack Myers, acting through attorney Zimmerman, offered to sell certain AMR stock to McDaniel. Jack Myers represented that such stock would be ultimately replaced by Compania stock. McDaniel rejected this proposition, since the terms were unacceptable and it did not directly involve Compania stock. Zimmerman advised McDaniel that the AMR securities would have to be held as an investment for a minimum of two years.
McDaniel was offered and accepted a position as Chief of Operations for Compania at an annual salary of $25,000. He commenced work on May 9, 1977, at Phoenix, Arizona. McDaniel was expected to run the day-to-day operations of Compania and maintain the company's office and financial records. His responsibilities included assisting Jack Myers and Hodges in moving mining equipment from storage in Nogales, Arizona to the mining site in Mexico, as well as assisting in the resolution of problems concerning ownership interests and rights in the Mexican mining claim.
Between May 9, 1977, and May 24, 1977, McDaniel was actively involved in Compania's operations. He had complete access to records, reports and correspondence. During this period, he informed Ernest Myers that he intended to purchase stock from Jack Myers. Ernest advised McDaniel not to do so, and explained that in his opinion, if Jack had money he would lose interest in the venture. Barnes also advised him to delay purchasing any stock until things were straightened out in the company. Barnes testified that "he [McDaniel] didn't want anyone else counseling him."
A meeting of Compania's Executive Committee was held in Phoenix in May 27, 28, 1977, to discuss strategy. There was apparently some division within the group regarding possible action. McDaniel attended the informal, and oft times factional, meetings with Ernest Myers, Bennett Cook and Charles Barnes. Problems concerning ownership and operation of the Mexican properties were discussed. At one point during the meeting Zimmerman tendered his resignation as corporate counsel. In addition to the discussions mentioned above, the Committee considered Jack Myers' nomination of McDaniel to Compania's board of directors.
Immediately following this meeting, McDaniel paid $12,500 to both Jack Myers and Hodges for a total of 45,000 shares of Compania common stock. McDaniel's cost per share equalled $0.5555, as contrasted to the $1.38 cost per share paid by purchasers of TMR limited partnership interests. Prior to the purchase, both Ernest Myers and Bennett Cook again asked that he not purchase this stock. Both were concerned about how it would appear to the TMR investors, if it became known that officers of the company were selling stock in Compania. Ernest Myers offered to make stock available to him at a later date if he would wait. At the time McDaniel purchased, he was aware of the poor cash position of Compania. He was also aware that the money paid for the Compania securities would not benefit Compania. The May 28, 1977, purchase was pursuant to an option agreement with Jack Myers under which McDaniel could acquire 180,000 shares of Compania stock for $100,000, or $0.5555 per share. McDaniel knew that the securities in question were unregistered.[3]
*159 McDaniel continued to work for Compania after his first purchase of Compania securities on May 28, 1977. His knowledge concerning the company's financial position and property ownership problems increased. Nevertheless, on July 12, 1977, and without any discussions with Ernest Myers or Bennett Cook, McDaniel purchased 36,000 shares from Jack Myers for $12,500, or $0.3472 per share, pursuant to a new purchase agreement of that date.
Thereafter, on July 15, 1977, McDaniel made his third and final purchase of Compania securities. He purchased 54,000 shares of stock from Jack Myers for $30,000, or $0.5555 per share. McDaniel then sold 43,200 of these shares to Reverend Howerton, a friend in Virginia, for $30,000, or $0.6944 per share. Howerton had been proposed by McDaniel as a prospective purchaser in April, 1977. McDaniel then transferred 7,200 shares of Compania stock to his friend Charles Barnes, believing that Jack Myers had wrongfully refused to honor a "commission" agreement with Barnes.
McDaniel was instrumental in preparing and supervising the execution of the stock certificates in order to effectuate the various stock transfers. McDaniel also made sure the transfers were recorded on the company records. The stock certificates did not bear a restrictive legend regarding subsequent transfers.
McDaniel remained actively engaged in activities on Compania's behalf. During August of 1977, he directly participated in negotiations with Mexican authorities concerning the status of the Padre Kino Mexican corporation, Compania's right to conduct mining operations in Mexico and the permits necessary to take equipment into Mexico for mining purposes.
Disenchanted with Compania's success, McDaniel consulted an attorney in September, 1977. He continued, however, to be employed by Compania until March, 1978. On March 28, 1978, McDaniel's attorney sent a telegram to Jack Myers and Hodges. The telegram sought to tender to Jack Myers 51,300 shares of Compania securities for $22,499.36, and to Hodges 12,500 shares of Compania securities for $12,500. Defendants refused the offer.
This action was filed April 4, 1978.

I. FEDERAL REGISTRATION VIOLATIONS: Sections 5 and 12 of the Securities Act

A. The Prima Facie Case

The Securities Act of 1933 was enacted by Congress as a responsive prophylactic measure to the economic crisis gripping the United States following the 1929 stock market crash. In accordance with such remedial purpose the Act has been interpreted as imposing strict liability upon persons who offer or sell unregistered securities in an interstate commerce setting unless it is shown that such securities or the transaction itself fall within an exemption from the registration requirements. Securities & Exch. Com'n v. Murphy, 626 F.2d 633 (9th Cir. 1980); Swenson v. Englestad, 626 F.2d 421 (5th Cir. 1980).
To state a prima facie case for a violation of federal securities laws arising under §§ 5 and 12(1) of the Securities Act,[4] a plaintiff must show:
1. the sale or offer to sell securities by the defendant;
2. the absence of a registration statement; and

*160 3. the use of the mails or facilities of interstate commerce in connection with the sale or offer.
Securities & Exch. Com'n v. Murphy, 626 F.2d 633 (9th Cir. 1980).
In the instant case, no serious dispute exists as to whether McDaniel has established prima facie a violation of the federal securities registration laws. Defendants admit that the securities were not registered with the appropriate federal (or state) agencies. The Private Placement Memorandum was printed by defendant Compania in Phoenix, Arizona, in connection with the limited partnership interests being peddled on its behalf by TMR. Such memorandum was carried to Maryland and Virginia for distribution to prospective investors, including McDaniel, in Compania's mining venture. Further, plaintiff McDaniel traveled from Virginia to Arizona and Mexico at Compania's expense pursuant to defendant Jack Myers' offer. Finally, plaintiffs paid for the May 28, 1977, purchase of Compania securities with a check drawn upon their Virginia bank.
The requisite prima facie showing has been made.

B. Compania Securities Are Not Exempt From Registration

The inquiry thus becomes whether each involved defendant can establish that as to them either the security or the transaction is exempt from the Section 5 registration requirements. The burden of proof in this regard is upon the party seeking protection from the Securities Act. SEC v. Ralston Purina Co., 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953); Securities & Exch. Com'n v. Murphy, 626 F.2d 633 (9th Cir. 1980); Doran v. Petroleum Management Corp., 545 F.2d 893, 899 (5th Cir. 1977). These exemptions are construed narrowly, and thus the burden on those seeking shelter is substantial. Securities & Exch. Com'n v. Murphy, supra, 626 F.2d at 641.
Here, defendants seek refuge from the federal registration requirements under three specific exemptions. First, it is contended that the securities are exempt from registration under Section 3(a)(9), 15 U.S.C. § 77c(a)(9), which applies to securities exchanged with existing securities holders. Second, defendants assert that Section 4(1), 15 U.S.C. § 77d(1), exempts the transaction as one involving the offer or sale by an issuer, underwriter or dealer. Finally, it is argued that the private offering exemption under either Section 4(2), 15 U.S.C. § 77d(2), or Rule 146, 17 C.F.R. Part 230.146 (1979), serves to exempt the transaction.
For the reasons which follow, the Court finds that defendants have failed to establish a cognizable exemption. The Court finds further that defendants Compania, Jack Myers and Hodges are liable to plaintiffs under Section 12(1) for the sale of the unregistered securities. Defendants Ernest Myers and Bennett Cook are derivatively liable to plaintiffs as controlling persons under Section 15, U.S.C. § 77o.

1. Section 3(a)(9) Exemption: Securities exchanged with existing securities holders
Section 3 of the Securities Act sets forth eleven classes of securities which are expressly exempt from the Section 5 registration requirements. Covered by Section 3 are specific types of securities or security interests which by their very nature represent a low risk venture to the prospective investor. Examples of such securities include the following:
1. government guaranteed securities, § 3(a)(2);
2. securities issued or guaranteed by a bank, § 3(a)(2);
3. short-term commercial paper, § 3(a)(3);
4. securities issued by a savings and loan institution, § 3(a)(5);
5. securities issued by common or contract carriers, § 3(a)(6); and
6. securities exchanged with existing security holders, § 3(a)(9).
Defendants seek to invoke the protection of Section 3(a)(9). That section exempts securities which are

*161 exchanged by the issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange.
There are no facts in the record which would support a finding that the Compania securities involved here were exchanged with existing security holders without remuneration for such exchange. Even if this exemption arguably applied to the initial exchange between AMR and its five directors, such exemption would not sanitize the securities. To be exempt under this section the exchange between McDaniel and defendants must meet the express requirements. The exchange does not. The securities sold to McDaniel neither fit within the wording of the provision nor within its underlying purpose of exempting low risk securities acquired during corporate reorganizations. Accordingly, the exemption does not apply.

2. Section 4(1) Exemption: Securities offered or sold by an issuer, underwriter or dealer
Section 4(1) of the Securities Act provides an exemption for securities which are offered or sold in transactions involving persons other than issuers, underwriters or dealers. It is defendants' position that AMR was not an "issuer" when it distributed Compania securities to Jack Myers and Hodges, along with the three other AMR shareholders, upon its dissolution. Thus, defendants conclude neither Jack Myers nor Hodges can be viewed as underwriters with respect to their turn-around sale of such securities to McDaniel. Accordingly, they assert the Compania stock was sold to plaintiff by persons other than issuers, underwriters or dealers and therefore exempt. Such logic overlooks the rudimentary facts of this case.
Section 2(11) defines "underwriter" and provides in pertinent part as follows:
The term "underwriter" means any person who has purchased from an issuer with a view to ... the distribution of any security, or participates or has a direct or indirect participation in any such undertaking.... As used in this paragraph the term "issuer" shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.
[Emphasis supplied]
Section 2(2) defines "person" as including individuals as well as corporations.
The facts as established at trial leave no doubt that AMR was an issuer within the meaning of Section 2(11) when it distributed the Compania securities it held to its only shareholders, Jack Myers, Hodges, Ernest Myers, Bennett Cook and Harold Bergen upon AMR's dissolution on May 28, 1977. At the time of AMR's dissolution, and all prior relevant times, AMR's board of directors included Jack Myers, Hodges and Ernest Myers; Compania's board of directors included Jack Myers, Hodges, Ernest Myers and Bennett Cook. The fact of such interlocking directorates is sufficient to support a finding that AMR was under "direct or indirect common control with the issuer". Therefore, the Court finds that AMR was a § 2(11) issuer of Compania securities for purposes of Section 4(1) exemption.
Having established that AMR "issued" Compania securities, whether Jack Myers and Hodges were underwriting such securities turns on their intentions. If defendants acquired these securities with a view to a subsequent distribution, then the defendants are statutory underwriters, and the exemption affords them no protection. If no such intention existed, then they are not, and the exemption spares them from liability.
That Jack Myers and Hodges had such intent is evident from even the most casual attention to the facts of this case. The Compania securities distributed by AMR did not contain any express restriction regarding their distribution. Both acquired the securities in question on May 28, 1977, the same day as McDaniel's first purchase. The juxtaposition of acquisition and resale *162 of stock on precisely the same date leaves only one reasonable conclusion  that the securities were acquired with a view towards distribution. Further support for this position is the fact that such securities were acquired by the Compania directors Jack Myers and Hodges and resold by them during the ongoing fund raising venture sponsored by Compania and being conducted by TMR through the sale of limited partnership interests. Accordingly, the exemption provided for in Section 4(1) is unavailable.

3. Section 4(2) and Rule 146: Private Offering Exemption

Defendants assert further that the transaction was a private offering and therefore exempt from registration under Section 4(2) of the Securities Act or Rule 146, 17 C.F.R. Part 230.146. The Court disagrees.
Section 4(2) expressly exempts from the Section 5 registration requirements "transactions by an issuer not involving any public offering". By its terms the exemption applies only to issuers. For purposes of Section 4(2), "issuer" is defined by Section 2(2) and means "every person who issues or proposes to issue any security". Plaintiffs argue that a common sense reading of the definitions necessitates the conclusion that defendants Jack Myers and Hodges are not "issuers" for purposes of the Section 4(2) exemption and thus are not entitled to seek its shelter. In this regard, the Court notes that the "controlling person" definition ascribed to the term "issuer" by the Section 2(11) definition, does not apply to the private offering exemption. Wassel v. Eglowsky, 399 F.Supp. 1330, 1362 n. 59 (D.Md. 1975). The Court agrees with plaintiffs' interpretation, but finds that even if Jack Myers and Hodges are issuers for purposes of the private offering exemption, the exemption would still not apply.
The Ninth Circuit recently adopted a four factor flexible test in analyzing the validity of an asserted private offering exemption. The calculus consists of the following four considerations:
1. the number of offerees;
2. the sophistication of the offerees;
3. the size and manner of the offering; and
4. the relationship of the offerees to the issuer.
Securities & Exch. Com'n v. Murphy, 626 F.2d 633, 644 (9th Cir. 1980). Nevertheless, the principle announced by the Supreme Court in SEC v. Ralston Purina, Co., supra, remains the "central feature in analysis of the private offering exemption." Securities & Exch. Com'n. v. Murphy, supra, 626 F.2d at 644 n.11. Focusing upon the nature of the offeree, the Supreme Court held that:
[T]he applicability of § 4(2) should turn on whether the particular class of persons affected needs the protection of the Act. An offering to those who are shown able to fend for themselves is a transaction `not involving any public offering'.
346 U.S. at 125, 73 S.Ct. at 984.
Moreover, it is clear that the party claiming the protection of the § 4(2) exemption must demonstrate that the conditions are met with respect to each offeree, not merely each purchaser. Securities & Exch. Com'n v. Murphy, supra, 626 F.2d at 645.
In 1974, the SEC adopted Rule 146, 17 C.F.R. Part 230.146, in order to provide business persons with objective standards upon which to rely when raising capital under the private offering exemption of Section 4(2).[5]See Preliminary Notes to *163 Rule 146. The Rule requires that an issuer, and those acting on behalf of the issuer, have reasonable grounds to and shall believe that the offeree is a sophisticated investor, that is one (a) capable of evaluating the merits and risks of the prospective investment or (b) financially able to bear the risk. Rule 146(d)(1).[6] Thus, simply stated, private placement offerees must be smart or rich. Prior to consummating a sale with such offeree, the issuer, and any person acting on the issuer's behalf, shall have reasonable grounds to and shall believe that the investor (a) is capable of evaluating the merits and risks of the prospective investment or (b) has consulted a financial advisor *164 and is additionally financially able to bear the risk. Rule 146(d)(2). Rule 146 further requires that each offeree have access to the same kind of information a registration statement would contain. Rule 146(e).
The primary focus of both Section 4(2) and Rule 146 is the nature and extent of the offerees' knowledge about the issuer. In either situation, it is incumbent upon the defendant to establish that all offerees had access to or disclosure of the same type of information a registration statement would provide. Securities & Exch. Com'n v. Murphy, supra, 626 F.2d at 647, 648. Doran v. Petroleum Management Corp., 545 F.2d 893, 908 (5th Cir. 1977). See also SEC v. Ralston Purina Co., supra. It is this feature of the private offering exemption that compels the resolution of the private placement issue against the defendants.
The record on this issue is clear. In March and April of 1977, Jack Myers, acting through Charles Barnes, offered to sell a portion of his AMR-Compania securities to Messrs. McDaniel, Olson and Duncan. The record also reveals that such securities were available for sale to any interested person. The defendants have failed to produce any evidence at trial that at the time of the offer, all offerees had either the necessary information available to them or the ability to bear the financial risk of the venture. Thus, regardless of any other considerations, defendants' failure to so show is fatal to the private offering exemption. Under the facts of this case, the exemption does not operate.
The Court observes that of all the potential plaintiffs in this financial fiasco, offeree McDaniel is the least deserving of any intended protection afforded by the registration law. McDaniel, while having no mining experience, was knowledgeable in business matters, with special training and a Master's degree in accounting. Further, McDaniel visited the Mexican mining properties prior to his purchase, and had the opportunity to determine the nature and extent of the activities at that location. He also met and talked with Jack Myers, Hodges and Sobarzo regarding the existing and proposed mining operations. McDaniel was aware of the highly speculative nature of the mining venture. As chief of Compania's operations, McDaniel had access to financial records, reports and correspondence. Although an investment in Compania could have been accomplished through the purchase of a limited partnership interest in TMR, McDaniel chose to deal with Compania securities directly. Such choice was influenced by the fact that an ownership interest in Compania was offered him at a price more favorable than was available to purchasers of TMR limited partnerships. Nevertheless, such avarice does not serve to bar recovery for Section 12(1) violations where (1) plaintiff arguably did not have access to all the information which a registration statement would provide, (2) defendants failed to establish that the other unidentified offerees were provided the necessary information, and (3) the offers and sales to plaintiff and purchasers of interests in TMR could arguably be considered as part of the same issue and thus be integrated for purposes of destroying the private offering exemption. See Securities & Exch. Com'n. v. Murphy, supra, 626 F.2d at 646.
As the district court in Wassel v. Eglowsky stated:
... However, even [Plaintiffs'] type of rainbow hunting, get-rich-quick investor who could not care less whether he gets in bed with others who for their own profit are trying to put something over on unsuspecting members of the public is not per se barred from recovering from persons who violate 12(1) and/or 10b-5....
399 F.Supp. 1330, 1365 (D.Md.1975).
Accordingly, the Court finds and concludes that the Compania securities were subject to the Section 5 registration requirements. The sale of such unregistered securities subjects the defendants to liability under Section 12(1) and Section 15 of the Securities Act.

*165 C. Liability Under Section 12(1) and Section 15

For the reasons stated above, defendants Jack Myers, Hodges and Compania are liable to plaintiffs pursuant to Section 12(1) of the Securities Act for the offer and sale to plaintiffs of unregistered securities in violation of Section 5 of the Securities Act.
Plaintiffs have met the conditions for recission under Section 12(1) of the Securities Act to the extent that they have tendered back to defendants unregistered securities purchased from Jack Myers and Hodges totaling 73,800 shares.
Defendants Ernest Myers and Bennett Cook are jointly and severally liable to plaintiffs pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o. for the Section 12(1) violations of Jack Myers and Hodges. Section 15 imposes derivative liability upon persons who:
through stock ownership, agency, or otherwise, ... controls any person liable under sections ... 77l [Section 12] of this title, shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.
This section imposes joint and several liability upon those persons who control a Section 12(1) violator. Whether Ernest Myers or Bennett Cook can be held liable under this section turns on whether they "controlled" Jack Myers and Hodges.
"Control" is defined by Rule 405, 17 C.F.R. Part 230.405(f) to mean:
the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.
The burden of establishing control is on the plaintiff. Pharo v. Smith, 621 F.2d 656 (5th Cir. 1980); G. A. Thompson & Co., Inc. v. Partridge, 636 F.2d 945, 957 (5th Cir. 1981). Good faith constitutes an affirmative defense to Section 15 liability. G.A. Thompson & Co., Inc. v. Partridge, 636 F.2d 945, 958 (5th Cir. 1981); See also Zweig v. Hearst Corp., 521 F.2d 1129 (9th Cir. 1975).
The evidence is that Ernest Myers, Bennett Cook, Jack Myers and Hodges, directly or through associates, had the power to direct management and policies of Compania. The evidence further establishes that Ernest Myers and Bennett Cook knew of the intended sale to McDaniel of the unregistered securities. Both advised McDaniel not to purchase the securities from Jack Myers. Such advice, however, was unrelated to any concern over the lack of registration and in fact Ernest Myers offered to sell McDaniel a portion of his unregistered Compania securities if McDaniel would wait for a while. Moreover, there was no evidence presented that defendants Ernest Myers and Bennett Cook ever attempted to exercise their corporate power to influence or monitor Jack Myers' or Hodges' actions. The trial testimony does establish that neither Ernest Myers nor Bennett Cook had any personal control over the activities of Jack Myers.
Whether Ernest Myers or Bennett Cook could exercise any degree of personal influence over the Section 12(1) violators, however, is irrelevant for purposes of Section 15 liability. The focus is upon the amount and degree of corporate control such persons had over the Section 12(1) violators and the extent to which the "controlling persons" were ignorant of the facts forming the basis for the Section 12 violation.
Here, Ernest Myers and Bennett Cook were aware of the impending sale of unregistered securities. Both were in a position of control with respect to the Section 12 violators. Neither presented evidence which would establish that they acted in good faith and were ignorant of the facts upon which Section 12(1) liability for Jack Myers and Hodges is founded. Accordingly, they are liable to plaintiffs under Section 15 of the Securities Act as "controlling persons".
*166 Plaintiffs are therefore entitled to judgment against Jack Myers, Hodges, Ernest Myers, Bennett Cook, and Compania, jointly and severally, in the amount of $34,999.36.

II. STATE REGISTRATION VIOLATIONS
The securities of defendant Compania sold by Jack Myers and Hodges to McDaniel were likewise required to be registered under Arizona Revised Statutes 44-1841 unless exempt pursuant to Section 44-1843, exempting certain securities, or Section 44-1844, exempting certain transactions. For the reasons stated previously, defendants have failed to establish that their sales of unregistered securities were exempt under any provision of the Arizona Securities Act.
The Court finds specifically, that the sale to the plaintiffs was not an isolated transaction under A.R.S. § 44-1844(4) but a part of a series of sales contemplated by Jack Myers and Hodges initially as part of an effort to raise $100,000 by the sale of 180,000 shares of stock owned by Jack Myers. Such plan was subsequently expanded to include those shares owned by defendant Hodges.

III. FEDERAL AND STATE ANTI-FRAUD VIOLATIONS
Plaintiffs have alleged that defendants made various material misrepresentations of fact in connection with the offer and sale of the Compania securities. Specifically, plaintiffs have charged violations arising under Section 12(2) of the Securities Act, 15 U.S.C. § 77l(2), Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), SEC Rule 10b-5, 17 C.F.R. Part 240.10b-5, and A.R.S. 44-1991 and 44-2001.
Prior to discussing the merits of the anti-fraud violation claims, the Court feels obliged to address one issue not raised by the parties. Prior to the Ninth Circuit's decision in Stephenson v. Calpine Conifers II, Ltd., 652 F.2d 808 (9th Cir. 1981), the issue of whether a private cause of action existed under Section 17(a) of the Securities Act had not been resolved. Stephenson held that:
[i]n light of the minimal differences between § 17(a) of the 1933 Act and § 10b of the 1934 Act, we think the reasoning of the Second Circuit [in Kirshner v. United States, 603 F.2d 234 (2d Cir. 1978)] is persuasive and find that a private right of action exists under § 17(a).
652 F.2d at 815.
Thus, in the Ninth Circuit a private cause of action under Section 17(a) may be maintained. The elements comprising such private cause of action, however, have not been set forth. It is noted that the Supreme Court has not spoken directly on this issue. See Aaron v. Securities Exchange Commission, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), the Supreme Court held that scienter was not a necessary element of a cause of action when the SEC proceeds under subsections (2) and (3) of § 17(a) of the Securities Act. Whether scienter will be a necessary element when a private person seeks to enforce rights under this section is unclear. One Circuit has suggested that scienter may be required in such circumstances. See Pharo v. Smith, 621 F.2d 656, 674 (5th Cir. 1980). Nevertheless, while the elements and defenses attendant to this new private cause of action are unclear, the gist of a § 17(a) claim is fraud. Accordingly, the plaintiffs' reliance and due diligence must in any event remain relevant considerations.
With respect to any of the above anti-fraud violation claims plaintiff must establish at a minimum that he was unaware of the untruth or omissions of fact. Alton Box Board Co. v. Goldman, Sachs & Co., 560 F.2d 916 (8th Cir. 1977) (plaintiff's knowledge of untruth negates claims asserted under § 12(2); Hirsch v. DuPont, 553 F.2d 750 (2d Cir. 1977) (no civil liability under § 10(b) or Rule 10b-5 if plaintiff knew or should have known of material misrepresentations); Holdsworth v. Strong, 545 F.2d 687 (10th Cir. 1976) cert. denied 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (plaintiff's reliance must be *167 reasonable). Furthermore, a plaintiff bringing an action under Section 10(b) and Rule 10b-5 must establish that he assessed available information as would a reasonable person in his position possessed with similar business experience. McLean v. Alexander, 420 F.Supp. 1057 (D.C.Del.1976) rev'd on other grounds, 599 F.2d 1190 (3rd Cir.)
In the present case, McDaniel knew or should have known of the untruths and/or omissions of fact contained in the TMR Private Placement Memorandum prior to his May, 1977, purchase. As Chief of Operations for Compania, he had access to records from which he could determine that the Private Placement Memorandum included misrepresentations and overstatements regarding the mining properties and proposed mining operations. Furthermore, McDaniel participated in corporate strategy meetings prior to his first purchase of Compania securities. The sum total of the information available to McDaniel was sufficient to alert any reasonable person to misstatements. Accordingly, reliance under the facts of this case would be unreasonable.
Plaintiff's claims for anti-fraud violations fail. Plaintiff has not established that he reasonably relied on information provided him by defendants and that he exercised due diligence in examining information otherwise available to him.
The foregoing opinion in its entirety constitutes this Court's findings of fact and conclusions of law.
Accordingly,
IT IS ORDERED, ADJUDGED AND DECREED that Defendants Jack D. Myers, Marvin D. Hodges, Ernest B. Myers, Bennett C. Cook and Compania Minera Mar de Cortes, Sociedad Anonimo, Incorporated, are jointly and severally liable to Plaintiffs Howard T. McDaniel and Murlean F. McDaniel in the total amount of $34,999.36 [plus interest] for the sale of unregistered securities in violation of state and federal securities law.
IT IS FURTHER ORDERED that the Clerk shall enter judgment accordingly.
NOTES
[1] McDaniel claims to have seen this report sometime before his initial stock purchase on May 28, 1977, although the report may not have been seen by McDaniel until after he became employed by Compania on May 9, 1977.
[2] The agreement between AMR and Compania contemplated 1,713,000 shares of Compania stock going to AMR. It appears that 1,713,000 shares were in fact issued. In May, 1977, Compania purported to issue 1,764,000 shares of its capital stock in exchange for AMR's interest in the Mexican mining properties. There is no explanation for the apparent difference of 51,000 shares. As explained above, the exact nature and extent of AMR's interest in such properties is unclear. However, it is clear that at all times relevant in this matter, neither Hodges, AMR nor Compania had legally secured whatever interest they claimed in the Mexican properties.

When AMR was dissolved on May 28, 1977, the Compania securities were distributed to its five shareholders, Jack Myers, Hodges, Ernest Myers, Bennett Cook and Harold Bergen. The focus of this lawsuit is on these Compania securities held by Jack Myers and Hodges and resold to plaintiff McDaniel.
[3] The registration provisions of the Securities Act of 1933 were enacted for the remedial purpose of discouraging sales of unregistered securities. Thus, a purchaser is not barred from maintaining an action under Section 12(1) merely because he knowingly purchases unregistered securities. Neuwirth Invest. Fund, Ltd. v. Swanton, 422 F.Supp. 1187 (D.C.N.Y.1975).
[4] Section 5(a) of the Securities Act of 1933, 15 U.S.C. § 77e(a) provides as follows:

Section 5. (a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly 
(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; ...
Section 12(1) imposes civil liability upon persons violating Section 5 and authorizes recovery from `[a]ny person who  (1) offers or sells a security in violation of Section 77e of this title ...' 15 U.S.C. § 77l(1).
[5] 17 C.F.R. Part 230.146 states in part:

(c) Limitation of Manner of Offering. Neither the issuer nor any person acting on its behalf shall offer, offer to sell, offer for sale, or sell the securities by means of any form of general solicitation or general advertising, including but not limited to, the following:
(1) Any advertisement, article, notice or other communication published in any newspaper, magazine or similar medium or broadcast over television or radio;
(2) Any seminar or meeting, except that if paragraph (d)(1) of this section is satisfied as to each person invited to or attending such seminar or meeting, and, as to persons qualifying only under paragraph (d)(1)(ii) of this section, such persons are accompanied by their offeree representative(s), then such seminar or meeting shall be deemed not to be a form of general solicitation or general advertising; and
(3) Any letter, circular, notice or other written communication, except that if paragraph (d)(1) of this section is satisfied as to each person to whom the communication is directed, such communication shall be deemed not to be a form of general solicitation or general advertising.
(d) Nature of offerees. The issuer and any person acting on its behalf who offer, offer to sell, offer for sale or sell the securities shall have reasonable grounds to believe and shall believe:
(1) Immediately prior to making any offer, either:
(i) That the offeree has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or
(ii) That the offeree is a person who is able to bear the economic risk of the investment; and
(2) Immediately prior to making any sale, after making reasonable inquiry, either:
(i) That the offeree has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or
(ii) That the offeree and his offeree representative(s) together have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of the prospective investment and that the offeree is able to bear the economic risk of the investment.
(e) Access to or furnishing of information.
Note: Access can only exist by reason of the offeree's position with respect to the issuer. Position means an employment or family relationship or economic bargaining power that enables the offeree to obtain information from the issuer in order to evaluate the merits and risks of the prospective investment.
(1) Either:
(i) Each offeree shall have access during the course of the transaction and prior to the sale to the same kind of information that is specified in Schedule A of the Act, to the extent that the issuer possesses such information or can acquire it without unreasonable effort or expense; or
(ii) Each offeree or his offeree representative(s), or both, shall have been furnished during the course of the transaction and prior to sale, by the issuer or any person acting on its behalf, the same kind of information that is specified in Schedule A of the Act, to the extent that the issuer possesses such information or can acquire it without unreasonable effort or expense. This condition shall be deemed to be satisfied as to an offeree if the offeree or his offeree representative is furnished with information, either in the form of documents actually filed with the Commission or otherwise, as follows:
* * * * * *
(g) Number of purchasers. (1) The issuer shall have reasonable grounds to believe, and after making reasonable inquiry, shall believe, that there are no more than thirty-five purchasers of the securities of the issuer from the issuer in any offering pursuant to the Rule.
[6] As reported on August 19, 1981, in the Bureau of National Affairs New & Comment, No. 617, SRLR, the SEC proposes to amend Rule 146 as follows:

Proposed Rule 506 modifies current Rule 146 by replacing the subjective `investor sophistication' test of suitability with the concept of `accredited investor.' The term `accredited investor,' which developed under Rule 242 and currently applies mainly to institutions would also be expanded to include investors with an annual gross income of $100,000 or a net worth of $700,000. Disclosure documents would not be required if only accredited investors participated in a limited offering, and under certain conditions up to 35 unaccredited investors could participate along with an unlimited number of accredited investors. The availability of the exemption would be restricted to issuers that have been in the '34 Act reporting system for less than 3 years, issuers that have been reporting for a longer period would be expected to use proposed simplified registration forms S-2 and S-3. See 616 SRLR Spec. Supp.
As previously stated, the defendants have utterly failed to adduce evidence that the offerees involved here meet the subjective "investor sophistication" test, let alone the more stringent standards proposed by Rule 506.