Homer E. STEPHENSON and Freda Lois Stephenson, his wife, Plaintiffs-Appellants,

v.

CALPINE CONIFERS II, LTD., a Limited Partnership, et al., Defendants-Appellees.

No. 78–3271.

United States Court of Appeals, Ninth Circuit.

Submitted Oct. 10, 1980.

Decided July 27, 1981.

James G. Luce, Diemer, Schneider, Foster and Luce, Palo Alto, Cal., for plaintiffs-appellants.

Thomas McInerney, P. Salter II, Haims, MacGowan & McInerney, Oakland, Cal., for defendants-appellees.

Before GOODWIN and PREGERSON, Circuit Judges, and NIELSEN,* District Judge.

* Honorable Leland C. Nielsen, United States District Judge, Southern District of California, sitting by designation.

NIELSEN, District Judge:

I Facts.

This case arises out of Homer and Freda Stephenson's $20,000 investment in a California limited partnership, Calpine Conifers II (hereinafter Calpine II). The Stephensons were told about Calpine II by Ethel Jaquess, an investment counselor. Ms. Jaquess was the individual general partner in Calpine II until her death in April of 1976. Until shortly before she died, Ms. Jaquess was the only representative of Calpine II with whom the Stephensons had any contact.

Calpine II was formed for the purpose of planting and selling Christmas trees. The Stephensons allege that at the time they made their initial $15,000 investment in Calpine II in October of 1975 and again in March of 1976, when they made a $5,000 capital contribution to the partnership, they were misled as to the success of Calpine II's tree planting program. In particular they claim that in October of 1975 Ms. Jaquess represented to them that approximately 80 acres of trees had been successfully planted by Calpine II and that the operation was on schedule. They also point to a February 20, 1976 letter from Ms. Jaquess in which she informed them that while she was seriously ill:

"... my husband Ron is well acquainted with the programs and contractual relations and agreements as well as current progress and future plans .... Additionally, in two more months we will have the services of our son, Garry, for full time coordination and closer supervision of the farming activities." CT 68

Neither the February 20, 1976 letter, nor a February 23 note from Ronald Jaquess requesting the Stephensons' 1976 capital contribution, mentioned any of the difficulties Calpine II was then experiencing.

Those difficulties did come to light in August of 1976 when the Stephensons received a "summary" prepared by Ronald and Garrison Jaquess. Ronald and Garrison had taken over control of Calpine II following Ethel's death and their "summary," in pertinent part, told the limited partners that:

"Delays caused by the farming contractor and the nursery supplying the transplant stock have had a net effect of setting the program back three years.

In 1975, an unexpected water supply problem required the drilling of a well at Calpine Ranch. Carl Welch, acting as an officer of Calpine Development Corp., was to arrange for the well to be dug in early spring. He failed to do so and the well was not completed until late summer. Only forty acres of stock were then planted after having been stored for five to six months. This resulted in a total death loss.

In 1976, Warren Welch had assumed the office of President of Quarter Circle CW Ranch, Inc. and conscienciously worked to bring the program up to date as much as possible. The intention was to plant sixty acres of 2–1 (3' yr. old) stock and forty acres of 2–0 (2 yr. old) stock. This would have provided 100 acres of growing trees as required by the original schedule. Improper preparation, packing, and shipping by the nursery caused a loss of over 50% in the stock received. The order for 2–1 stock was not completely filled because of aphid infestation at the nursery. Therefore, at present only 40 acres of 2–1 stock has been planted of which stock over 50% has died." CT 72.

In September of 1976 the Stephensons visited the Calpine II farm and discovered that no more than 40 acres were planted and that no more than 10% of the trees were still alive.

On October 26, 1976 the Stephensons filed a nine-count complaint in which they alleged that a number of defendants violated § 10 of the 1934 Securities and Exchange Act (15 U.S.C. § 78j), Rule 10b–5 (17 CFR 240.10b–5), §§ 12, 12(2) and 17(a) of the 1933 Securities Act (15 U.S.C. §§ 77*l*, 77*l*(2), and 77q), California Corporations Code §§ 15021, 25110, 25401, 25501, and 25503 and California Business and Professions Code §§ 10210 and 10331. The complaint also alleged that the defendants were guilty of common law fraud and were liable to the Stephensons for punitive damages.

Ronald Jaquess, Garrison Jaquess, and Calpine II were named as defendants, as well as Calpine Development Company, Inc. (hereinafter Development), the corporate general partner in Calpine II.[1]

On May 5, 1978 Calpine II, Development, and the Jaquesses moved for summary judgment on all causes of action. On May 26, 1978 those motions were granted in part. As to Calpine II the cause of action demanding an accounting under California Corporations Code § 15021 was dismissed. As to Development the district court left standing only the claim under § 12 of the 1933 Act and the claims for common law fraud and punitive damages; the remainder of the claims against Development were dismissed. With respect to the Jaquesses the entire action was dismissed.

On June 7, 1978 the district court filed orders granting the summary judgments and directing, under Rule 54(b), Fed.R. Civ.P., that judgment in favor of the Jaquesses be entered. On June 9, 1978 the Stephensons moved under Rules 59 and 60 for a new trial and for relief from the June 7 orders. On September 27, 1978 orders denying those motions were filed and on October 10, 1978 the Stephensons filed a notice of appeal in which they sought review of both the summary judgments and the subsequent orders denying relief under Rules 59 and 60.

II Scope of this Appeal.

■ ·The defendants have asked that we dismiss the appeal from the June 7, 1978 summary judgments on the grounds that the October 10, 1978 notice of appeal was filed more than 30 days after the judgments were entered and the orders filed. We decline to do so because plaintiffs' June 9, 1978 motions for relief from the summary judgments were proper under Rule 59(e),[2] and as such suspended the 30-day limitation period set forth in Rule 4(a), Fed.R.App.P.

Our conclusion that a Rule 59 motion is proper in this context is predicated on *Mir v. Fosburg*, 646 F.2d 342 at 344, (9th Cir. 1980), where this court held that a Rule 59(e) motion is the proper vehicle for seeking reconsideration of an order granting dismissal without leave to amend. We discern no valid distinction, for Rule 59(e) purposes, between an order granting summary judgment and one dismissing a complaint without leave to amend. Both orders are dispositive trial court determinations of law and both should be subject to reconsideration under Rule 59(e). *See* 6 Moore *Federal Practice*, p. 56–1549, ¶ 56.26–1 (2nd ed. 1976), *Sonnenblick-Goldman Corp. v. Nowalk*, 420 F.2d 858, 859 (3rd Cir. 1970).

■ The fact that plaintiff's motions were not specifically denominated as ones brought under Rule 59(e) does not alter their impact on Rule 4(a). *Whittaker v. Whittaker Corp.*, 639 F.2d 516, 520 (9th Cir. 1981), *Mir v. Fosburg, supra*, at 1707, *Sea Ranch Ass'n v. California Coastal Zone Conservation Comm'n*, 537 F.2d 1058, 1061 (9th Cir. 1976). Since the motions were made within 10 days of the summary judgments and could have been brought under Rule 59(e), they suspended the time for appeal until they were denied on September 22, 1978. *Whittaker v. Whittaker Corp., supra*, 639 F.2d at 520. The October 10, 1978 notice of appeal from the summary judgments was thus well within the bounds of Rule 4(a).

■ We also note that insofar as we are treating the motions for relief as Rule 59(e) motions, the September 27 order denying them is itself appealable, *Walker v. Bank of America NT & SA*, 268 F.2d 16, 25 (9th Cir. 1959), *cert. denied*, 361 U.S. 903, 80 S.Ct. 211, 4 L.Ed.2d 158, (1959), and the October 10, 1978 notice of appeal perfected plaintiffs' appellate rights as to that order as well.

---

1. Also named as defendants were Quarter Circle CW Ranch Corp., Stella Welch, Warren Welch, Weldon-Jaquess Securities Co., Inc., Donald M. Weldon, Don Richards Stephens, John Pitcairn, Lee Wood and Does I through XX.

2. Rule 59(e) provides: "A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment."

■ While we cannot dismiss the appeal as untimely, we must dismiss it to the extent it is from relief granted in favor of Calpine II and Development. Under 28 U.S.C. § 1291 we are without jurisdiction to hear an appeal from their partial summary judgments because the district court did not order entry of those judgments pursuant to Rule 54(b). *Hamman v. United States*, 399 F.2d 673 (9th Cir. 1968).

■ For much the same reason, we do not think the September 27 order, insofar as it affects Calpine II and Development, is appealable. While the denial of a Rule 59(e) motion is appealable, *Walker, supra,* we do not think a Rule 59(e) motion could have been entertained with respect to Calpine II or Development. Our conclusion in this regard is based on the fact that no judgments were ever entered in favor of Calpine II or Development, and on the language of Rule 59(e),[3] which we think clearly contemplates entry of judgment as a predicate to any motion. Our holding is supported by the fact that were we to permit Rule 59(e) motions without entry of judgment, litigants could obtain appellate review of partial judgments by simply appealing a Rule 59(e) order, completely by-passing the requirements of Rule 54(b) and 28 U.S.C. § 1291. We do not think that the court in *Walker, supra,* or the drafters of Rule 59 intended such a result. Accordingly, since no 59(e) motion could have been made with respect to Calpine II or Development, insofar as the September 27 order effects them, we treat it as an interlocutory order and dismiss plaintiffs' appeal therefrom. *See Carey v. Greyhound Company,* 424 F.2d 485, 486–487 (9th Cir. 1970).

This leaves for review on the merits the summary judgments entered in favor of the Jaquesses and the order denying relief from those judgments.

### III The Summary Judgments.

#### a) Rule 10b–5

■ Ronald and Garrison Jaquess argue that they were entitled to summary judg-

ment on the Stephenson's 10b–5 claim because the Stephensons did not rebut the Jaquesses' affidavits.

In his affidavit Ronald Jaquess swore that although he was secretary-treasurer of Development from late 1972 through April or May of 1976 he did not participate in any fashion or manner in the management of either Development or Calpine II until immediately prior to his wife's death in April of 1976. For his part Garrison Jaquess said that he had nothing to do with the management or operation of Calpine II or Development prior to his discharge from the Navy on March 13, 1976.

The principal conclusion the Jaquesses would draw from their affidavits is that any acts Ronald and Garrison participated in occurred after the Stephenson's initial investment in Calpine II in October of 1975 and were therefore beyond the scope of Rule 10b–5. The Jaquesses rely on the following language from *Radiation Dynamics v. Goldmuntz,* 464 F.2d 876, 890–891 (2d Cir. 1972):

> "The essential purpose of Rule 10b–5, as we have stated time and again, is to prevent corporate insiders and their tippees from taking unfair advantage of the uninformed outsiders. (Citations) It was not intended to provide an escape hatch through which disgruntled buyers and sellers could avoid transactions to which they had become committed, but which had not been fully consummated by the formal exchange of the money or the securities agreed upon to be exchanged."

The first problem with this argument is its premise that, as a matter of law, the Stephensons irrevocably committed themselves to Calpine II in October of 1975. While the Jaquesses argue that upon making their original investment in Calpine II the Stephensons became bound to make continuing capital contributions, the partnership articles provide that a "defaulting Partner shall have no personal liability for the difference between the sale price of his

---

**3.** *See* footnote 2, *ante.*

partnership interest and the amount of his assessment." CT 49. Given the limited liability the Stephensons would incur by defaulting on their 1976 capital contribution, the Jaquesses could not establish as a matter of law that 10b–5 liability terminated at the time of the Stephensons' original investment. As we said in *Lewelling v. First California Company*, 564 F.2d 1277, 1280 (9th Cir. 1977), "[p]recisely when the transactions were finalized is a question of intent for the finder of fact."

■ While 10b–5 liability could not, as a matter of law, terminate in October of 1975, by the same token it could not extend beyond March 31, 1976, the date the Stephensons made their last payment to Calpine II. At no time after that date did the Stephensons part with any more money or acquire any further interest in Calpine II. Thus at no time after March 31, 1976 were plaintiffs purchasers of securities as required by *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).[4]

■ Since March 31, 1976 was the last day on which the Jaquesses' conduct could give rise to liability under Rule 10b–5, their affidavits must show, as a matter of law, that defendants were not guilty of actionable conduct before that date. Moreover those affidavits must be viewed in a light most favorable to the Stephensons. *Spectrum Financial Companies v. Marconsult, Inc.*, 608 F.2d 377 (9th Cir. 1977). If the affidavits give rise to any reasonable inference from which liability might be imposed, the summary judgments cannot be sustained. *Exnicious v. United States*, 563 F.2d 418 (10th Cir. 1977).

In determining the sufficiency of the affidavits we must first consider the nature of the Jaquesses' duty under Rule 10b–5. In *White v. Abrams*, 495 F.2d 724, 735–736 (9th Cir. 1974) we said that the scope of a defendant's duty under Rule 10b–5 should be determined by considering five factors: (1) the relationship of the defendant to the plaintiff; (2) the defendant's access to information, compared to that of plaintiff; (3) the benefit the defendant derived from the relationship; (4) the awareness by the defendant of the plaintiff's reliance on him or her; and (5) the defendant's activity in initiating the securities transaction in question.[5]

■ The *White v. Abrams* analysis is not a rigid, mechanical formula. Rather it posits a broad continuum ranging from fiduciaries, whose affirmative duty of disclosure is unparalleled, to complete strangers, who need only refrain from intentional misrepresentations. *White v. Abrams, supra*, 495 F.2d at 736. Application of the factors is

---

**4.** In this respect the instant case is distinguishable from *Lewelling v. First California, supra*, and *Lanning v. Sewold*, 474 F.2d 716 (9th Cir. 1973). In *Lewelling* the defendant brokerage firm had made a number of stock purchases on behalf of plaintiff without his knowledge; after each purchase the firm would contact the plaintiff and inform him of the purchase and then allegedly mislead him as to the value of the stock purchased. The brokerage firm in *Lewelling* tried to argue that any misrepresentations occurred after plaintiff had purchased the stock and hence after he was committed to the transaction within the meaning of *Radiation Dynamics*. The district court however found that no commitment occurred until after the plaintiff had been informed about the purchase, heard his broker's representation, and acquiesced in the purchase. In the instant case, unlike *Lewelling*, the plaintiffs themselves executed the purchases of their interest in Calpine II and thus any fraud occurring after these purchases would not be actionable.

In *Lanning v. Sewold, supra*, the plaintiff had purchased a number of shares in a Washington telephone company. After those purchases were complete the president of the company convinced the sellers, through misrepresentations, to rescind their sales to plaintiff. This Court held that although the alleged statements occurred well after the plaintiff's purchase had been completed those statements were "in connection" with the purchase and thus actionable. 474 F.2d at 719. As the *Lewelling* opinion points out however: "... the 'fraud' in *Lanning* went to a collateral but directly related matter, and not to the inducement for the plaintiff's purchases." 564 F.2d at 1280, n. 4.

**5.** In *Kidwell ex rel. Penfold v. Meikle*, 597 F.2d 1273, 1294 (9th Cir. 1979), we reaffirmed this analytical framework saying, "[a]lthough *White v. Abrams* has been overruled insofar as it contemplates liability without scienter, [citation] its approach to the duty question is otherwise good law...."

simply a means of determining where on the continuum a particular defendant belongs.

■ In this case we think application of the *White* analysis makes the duty question a triable issue. We think a trier of fact might reasonably impose on these defendants a duty to disclose material information about Calpine II. Our conclusion is based squarely on our consideration of the *White* factors. We think the Jaquesses' relationship to Calpine II and through Calpine II to the Stephensons, while not particularly significant standing alone, points more toward a duty to disclose than away from it.[6] Similarly, we think the Jaquesses' greater access to information about Calpine II through their association with Ethel Jaquess supports a duty to disclose. We find particularly important, however, the fact that given the difficulties Calpine II was experiencing in early 1976, any compensation the Jaquesses were expecting would have come from the capital contributions of people like the Stephensons. This put the Jaquesses in a position to directly benefit from the Stephensons' investment.[7] In addition, by assuming control over Calpine II while Ethel Jaquess was ill, both men could reasonably expect that investors would rely on them to disclose material information about Calpine II. Quite simply, given the Jaquesses' financial interest in the capital contributions, and given the limited partners' probable reliance, we do not think it would be unfair to require disclosure.

Our conclusion with respect to Ronald Jaquess is also supported by the fact that he initiated part of the Stephensons' investment by requesting their 1976 capital contribution. While this factor is not present with respect to Garrison Jaquess, we do not feel that its absence is significant enough to diminish any duty he owed Calpine II's investors.

Since the Jaquesses may have been duty-bound to disclose material information about Calpine II, their affidavit must establish that they were unaware of any such information prior to March 31, 1976.[8] The affidavits, however, do not meet this burden.

In his affidavit Ronald Jaquess claims that he did not participate in the management of either Calpine II or Development until April of 1976; he also denies having any knowledge of his wife's representations to the Stephensons, including the reassuring letter she sent to them on February 20, 1976. However, Ronald's affidavit itself contains admissions which contradict these claims. For instance the affidavit concedes that from 1972 through 1976 Ronald was secretary-treasurer of Development. From this fact a person might infer that Ronald Jaquess, contrary to his claims, participated in the management of Development and was aware of the tree-planting problems. Ronald Jaquess's affidavit also concedes that on February 23, 1976 he asked the Stephensons for their 1976 capital contribution to Calpine II. From this involvement in Calpine II one might infer, again contrary to his claims, that Ronald knew about his wife's February 20, 1976 letter and was at that time participating in the management of Calpine II. Both of these inferences are bolstered by the fact that during this period of time Ethel was incapacitated and might be expected to look to her husband for assistance. These conflicting inferences about Ronald Jaquess's role and knowledge must be resolved in favor of the Stephensons. *See Spectrum Financial, supra,* 608 F.2d at 380.

**6.** In this respect the Jaquesses are somewhat akin to the defendants in *Zweig v. Hearst Corp.*, 594 F.2d 1261 (9th Cir. 1979), and *Spectrum Financial Companies, supra*, where indirect relationships with plaintiffs were sufficient to impose a duty of disclosure.

**7.** In this respect the Jaquesses are much like the accounting firm in *Spectrum Financial, supra*, whose fees were to be paid from the pro-

ceeds of the disputed transaction. 608 F.2d at 381.

**8.** Since the Jaquesses claim that they made no representations to the Stephensons before March 31, 1976, we need not consider the possibility that all material information was in fact disclosed.

Garrison Jaquess's position is no stronger than his father's. In his affidavit Garrison claims that he did not know about Calpine II's difficulties until well after the Stephensons' March 31, 1976 contribution. However his affidavit concedes that before the Stephensons made that contribution he was planning to leave the Navy because he knew that his mother was terminally ill and needed his help with Calpine II. From this fact a reasonable person might infer that Garrison had been informed about the problems with the Christmas trees and perhaps about his mother's letter of February 20, 1976, in which she mentioned Garrison's plans to leave the Navy. These inferences clearly contradict Garrison's self-serving denials; hence the extent of Garrison's pre-March 31, 1976 knowledge is also a disputed factual issue, not subject to resolution on a motion for summary judgment.

Since the Jaquesses may have owed the Stephensons a duty to disclose material information they were privy to, and since the extent of their knowledge was not conclusively established by their affidavits, the summary judgment granted in their favor on the 10b–5 claim must be reversed.

**b) § 17(a) of the Securities Act of 1933**

 In the court below the parties treated the fourth cause of action, plaintiffs' claim under § 17(a) of the 1933 Act, as if its elements were identical to those alleged in plaintiffs' 10b–5 claim. Defendants thus urged dismissal of the fourth cause of action on the same grounds asserted with respect to the first cause of action. As we have seen, the Jaquesses were not entitled to summary judgment on the 10b–5 claim and, accepting their view of § 17(a), were not entitled to summary judgment on the fourth cause of action either.

Before disposing of the fourth cause of action, however, one issue not raised by the parties must be resolved. Neither the Supreme Court nor this circuit has held that a private right of action exists under § 17(a) of the 1933 Act. *Aaron v. SEC*, 446 U.S.

680, 689, 100 S.Ct. 1945, 1951, 64 L.Ed.2d 611 (1980), *Bosse v. Crowell, Collier and MacMillan*, 565 F.2d 602, 610 n. 12 (9th Cir. 1977). The Second Circuit in *Kirshner v. United States*, 603 F.2d 234 (2nd Cir. 1978), however, has found such a right of action. Agreeing with Judge Friendly's comments in *SEC v. Texas Gulf Sulphur, Inc.*, 401 F.2d 833, 867 (2nd Cir. 1968), the *Kirshner* court said:

. . . there (is) little practical point in denying the existence of a right under § 17 once it is established that an aggrieved buyer has a private action under § 10(b) of the 1934 Act. 603 F.2d at 241.[9]

In light of the minimal differences between § 17(a) of the 1933 Act and § 10(b) of the 1934 Act, we think the reasoning of the Second Circuit is persuasive and find that a private right of action exists under § 17(a). Accordingly, the Jaquesses' summary judgments on the fourth cause of action must be reversed.

**c) The Third, Fifth, Sixth and Seventh Causes of Action.**

In the court below defendants moved to dismiss the third cause of action, alleging violation of § 12 of the '33 Act through use of a misleading prospectus and oral communication, on the grounds that the Jaquesses' affidavits established their ignorance as to the condition of Calpine II at the time the Stephensons were purchasing their interest in the partnership. The defendants moved on the same grounds to dismiss the fifth, sixth and seventh causes of action, the Stephensons' pendent claims for common law fraud, punitive damages, and violation of the California analogues to § 12 of the 1933 Act, California Corp.Code §§ 25401 and 25501. As we have seen summary judgment on these grounds was not appropriate because the state of the Jaquesses' knowledge is a disputed factual issue. Thus as to the third, fifth, sixth and seventh causes of action, defendants did not meet their burden on a motion for summary judgment, and finding no other valid grounds for dis-

---

**9.** *Accord, Daniel v. Teamsters*, 561 F.2d 1223, 1244–1246 (7th Cir. 1977), *contra, Shull v.* *Dain, Kalamn & Quail, Inc.*, 561 F.2d 152 (8th Cir. 1977).

missal in the record, we must reverse the summary judgments on these claims as well.

#### d) The Second and Ninth Causes of Action

Plaintiffs' second and ninth causes of action allege that the defendants violated § 5 of the '33 Act, Calif.Corp.Code §§ 25110 and 25503, and Calif.Business & Prof.Code §§ 10270 and 10331, by offering to sell plaintiffs securities for which no federal or state registration statement was in effect, although one was allegedly required.

In the district court the Jaquesses argued that the second and ninth causes of action should be dismissed on four grounds. First they argued that they could not have been "sellers" of securities within the meaning of the securities laws because they did not participate in any of the sales to the Stephensons. However, as we have seen, the Jaquesses' participation in March 31, 1976 capital contribution is a matter of factual dispute and thus not subject to summary judgment.

Secondly, defendants argued that the statute of limitations barred the second cause of action because Homer Stephenson's deposition establishes that the October 26, 1976 complaint was filed more than a year after the first sale to him and more than three years after the securities were offered to the public. While the deposition might be interpreted as making the complaint untimely, Stephenson's May 15, 1978 affidavit clarifies his deposition. In the affidavit Stephenson states that he bought his first interest in Calpine II after October 27, 1975 and first heard about Calpine II on December 9, 1973. In light of this affidavit plaintiffs' second cause of action was not, as a matter of law, barred by the statute of limitations.

■ Thirdly, defendants argued that any offer made to the Stephensons was not made by "means or instruments of transportation or communication in interstate commerce or any of the mails to sell a security" because the Stephensons purchased their limited partnership in a face-to-face meeting with Ethel Jaquess; hence defendants argued that plaintiffs could not meet the jurisdictional requirements of § 5 of the '33 Act. This argument ignores Ethel's February 20, 1976 letter and Ronald's February 23, 1976 reminder note. In light of those letters, summary judgment would not have been appropriate on this ground either.

■ Finally, the defendants argued that the sale of the partnership interests was a private offering exempt from either federal or state registration requirements; the defendants claimed that the persons who were offered the interests were experienced investors who did not need the protection of the securities laws. The financial experience of the offerees was clearly a question of fact which could not be conclusively foreclosed by the inferences drawn from the Stephensons' relationship with Ethel Jaquess. *See Doran v. Petroleum Mgmt. Corp.*, 545 F.2d 893, 909 (5th Cir. 1977).

Since the defendants asserted no grounds which justified dismissal of the second or ninth causes of action and we can find none in the record, the summary judgments on these claims are also reversed.

#### e) The Eighth Cause of Action

Plaintiffs' eighth cause of action seeks relief under Cal.Corp.Code § 15021, which permits one partner to get an accounting from any partner who has derived profit from the partnership without the consent of all the partners. Under *Prince v. Harting*, 177 Cal.App.2d 720, 2 Cal.Rptr. 545 (1960), a non-partner who aids and abets a partner in defrauding the partnership is jointly and severally liable under § 15021.

■ On July 16, 1976 Calpine II, by way of a check signed by Garrison Jaquess, paid Ronald Jaquess $23,100 in past due management fees; on July 19, 1976 Ronald Jaquess paid Calpine $20,000 for a partnership interest in Calpine II. CT 436. While there may very well be an innocent explanation for these transactions, with the partnership then experiencing great difficulties, payment of the past due management fees to a

person who later swore he had only been involved in the partnership since April of 1976 might also have been fraudulent; thus both Jaquesses could be liable to the Stephensons under § 15021 and the summary judgment on this cause of action must be reversed as well.

IV Post-Judgment Motions.

Since the summary judgments entered in favor of the Jaquesses must be reversed, we also vacate the September 27, 1978 order to the extent it upholds those judgments. Since the district court erred as a matter of law in granting the summary judgments, we believe it also abused its discretion in denying relief from them. *Cf. Walker v. Bank of America, supra,* 268 F.2d at 25–26.

The appeal is DISMISSED in part; the judgments properly before us are REVERSED and REMANDED; and the order before us is VACATED.