Walter D. BALLA, et al.,
Plaintiffs–Appellants,

v.

IDAHO STATE BOARD OF CORRECTIONS, et al.,
Defendants–Appellees.

Walter D. BALLA, et al.,
Plaintiffs–Appellees,

v.

IDAHO STATE BOARD OF CORRECTIONS, et al.,
Defendants–Appellants.

Nos. 87–3800, 87–3959.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 16, 1988.

Decided March 3, 1989.

Stephen L. Pevar, American Civil Liberties Union, Denver, Colo., for plaintiffs-appellants-cross-appellees.

Robert R. Gates, Deputy Atty. Gen., State of Idaho, Boise, Idaho, for defendants-appellees-cross-appellants.

Before WRIGHT, WALLACE and HUG, Circuit Judges.

WALLACE, Circuit Judge:

In these consolidated appeals, Balla and a class of prisoners (prisoners) incarcerated in Idaho appeal from the denial of their motions for contempt and for reconsideration. The prisoners contend that the district court (1) employed the wrong order as a benchmark against which to judge the compliance of the Idaho State Board of Corrections (Board) for purposes of their contempt motion, (2) erroneously denied their motion for contempt, and (3) erroneously denied their motion to reconsider. In its cross-appeal, the Board challenges the district court's refusal to grant an extension of time to comply with a court-ordered population cap. The Board also contests the district court's legal conclusion that Idaho Code § 20–223 requires the state to provide a treatment program for sex offenders. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the district court's denial of the prisoners' motions for contempt and for reconsideration. We also affirm the district court's refusal to grant an extension of time to the Board. We reverse the district court's conclusion that Idaho Code § 20–223 requires a treatment program.

I

In 1981, the prisoners brought this action pursuant to 42 U.S.C. § 1983 against the Board and various prison officials. They alleged a range of unconstitutional conditions of confinement in the Idaho State Correctional Institution, main site (prison), which is located south of Boise, Idaho. The prisoners sought declaratory and injunctive relief as well as damages. Trial before the district judge lasted 13 days.

On November 1, 1984, the district court issued an opinion and order holding that prison conditions violated the eighth and fourteenth amendments. *Balla v. Idaho State Board of Corrections*, 595 F.Supp. 1558 (D.Idaho 1984) (*Balla I*). In the section of its opinion dealing with psychiatric care, the court adopted six "essential" components of a mental health treatment program required by the Constitution. *Id.* at 1576–77. The court also held that Idaho Code § 20–223, the state's statutory parole scheme, required the Board to establish a treatment program for sex offenders. *Id.* at 1577–78. At the end of its opinion, the court issued a skeletal order requiring the Board to submit in writing within 180 days a plan that would meet the six constitutional minimum standards and would embody the required sex offender program. *Id.* at 1583.

The district court held a compliance hearing on June 27 and 28, 1985. It issued an

order on July 11, 1985, which reviewed the adequacy of the Board's plans, adopted in full the plan for providing psychiatric care, adopted with one modification the plan for treating sex offenders, and ordered implementation by October 1, 1985.

On October 10, 1985, the prisoners filed a motion for contempt. A hearing was held on July 29, 1986. The district court denied the prisoners' contempt motion on August 18, 1986, in an order which also closed to relitigation all issues except overcrowding. The prisoners brought a motion for reconsideration on August 27, 1986, and it was denied on December 12, 1986. On March 25, 1987, the district court issued a second opinion holding that double celling in the prison violated the Constitution. *Balla v. Board of Corrections*, 656 F.Supp. 1108 (D.Idaho 1987) (*Balla II*). On April 3, 1987, the Board filed a Rule 59 motion to alter or amend the judgment. The court granted in part and denied in part this motion on May 20, 1987.

## II

■ In their appeal, the prisoners maintain that the district court erroneously denied their motions for contempt and for reconsideration. We review the denial of a motion for contempt for abuse of discretion. *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir.1986) (*Donallco*). We also review a denial of a proper motion for reconsideration under Fed.R.Civ.P. 59(e) for abuse of discretion. *Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.*, 833 F.2d 208, 211 (9th Cir. 1987) (*Coastal Transfer*); *Swimmer v. IRS*, 811 F.2d 1343, 1345 (9th Cir.1987); *see also Frederick S. Wyle P.C. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir.1985) ("manifest" abuse of discretion standard); *Walker v. Bank of America National Trust & Savings Association*, 268 F.2d 16, 25 (9th Cir.) (same) (*Walker*), *cert. denied*, 361 U.S. 903, 80 S.Ct. 211, 4 L.Ed.2d 158 (1959).

### A.

Before we can address whether the district court erred in denying the prisoners' motion for contempt, we must face a threshold issue: Which court order should the district court have used to measure the Board's compliance for purposes of the prisoners' contempt motion? The Board argues that the district court properly measured compliance against its July 11, 1985, order, which approved and incorporated concrete plans for compliance with the November 1, 1984, opinion. The prisoners argue that the benchmark for compliance should have been *Balla I*, the November 1, 1984, opinion and order. The answer to this question depends upon the legal relationship between the November 1 and the July 11 decisions. Since this is a purely legal question, we review it independently. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc) (*McConney*), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

■ The district court's November 1 opinion and order was interlocutory in nature. Because it did not resolve all the issues as to all the parties on the merits, leaving nothing to be done but to execute the judgment, this order was not a "final" order under 28 U.S.C. § 1291. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978) (*Coopers & Lybrand*). The order contained a declaration of legal principles as well as a skeletal order requiring the Board to "submit a plan in writing within one hundred eighty (180) days ... which will establish a psychiatric care program [including a sex offender treatment program] for the inmates" as required by the opinion's conclusions of law. *Balla I*, 595 F.Supp. at 1583. This relief was, by its own terms, incomplete. Although our court has not addressed this issue, other circuits have ruled that court orders which require the submission of detailed plans are not final orders appealable under 28 U.S.C. § 1291. *See, e.g., Sherpell v. Humnoke School District No. 5 of Lonoke County*, 814 F.2d 538, 539–40 (8th Cir.1987) (order finding school environment racially discriminatory and ordering formation of biracial committee as well as formulation and submission of remedial plans not appealable under section 1291); *Groseclose v. Dutton*,

788 F.2d 356, 358–61 (6th Cir.1986) (per curiam) (court order finding death row conditions unconstitutional and ordering nomination of a master and submission of a remedial plan not a final judgment); *Liddell v. Board of Education of City of St. Louis*, 693 F.2d 721, 722–23 (8th Cir.1981) ("A district court order requiring submission of a plan, without more, is not appealable.") (footnote omitted); *Spates v. Manson*, 619 F.2d 204, 208–11 (2d Cir.1980) (order finding unconstitutional denial of library access and ordering submission of a plan, yet not mandating content of plan, held not appealable); *Taylor v. Board of Education*, 288 F.2d 600, 601–02 (2d Cir. 1961) (order directing school board to submit desegregation plan not appealable) (*Taylor*); *but cf. United States v. Alabama*, 828 F.2d 1532, 1536–38 (11th Cir. 1987) (per curiam) (where order requiring submission of plans is itself detailed, specific, and comprehensive, it is appealable under § 1291), *cert. denied*, — U.S. —, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988).

■ Courts have inherent power to modify their interlocutory orders before entering a final judgment. *Marconi Wireless Telegraph Co. v. United States*, 320 U.S. 1, 47–48, 63 S.Ct. 1393, 1414–15, 87 L.Ed. 1731 (1943); *John Simmons Co. v. Grier Brothers Co.*, 258 U.S. 82, 88, 42 S.Ct. 196, 198, 66 L.Ed. 475 (1922). In addition, the Federal Rules of Civil Procedure explicitly grant courts the authority to modify their interlocutory orders. *See* Fed.R.Civ.P. 54(b) (any order which is not certified under Rule 54(b) and which adjudicates fewer than all the claims as to all the parties "is subject to revision at any time before the entry of [final] judgment").

■ In its memorandum order dated July 11, 1985, the district court explicitly "adopted" the state's plans after ruling that they were "adequate ... for compliance with this court's November Opinion." Thus, the July 11 order operated as a legal modification and completion of the November 1 opinion and order. We hold, therefore, that the district judge properly used the July 11 order as the benchmark for judging the Board's compliance.

■ Our holding is consistent with settled principles of the law of civil contempt. Civil contempt is appropriate only when a party fails to comply with a court order that is both specific and definite. *Gifford v. Heckler*, 741 F.2d 263, 265 (9th Cir.1984) (*Gifford*). Thus, to support a contempt motion, the order alleged to have been disobeyed must be sufficiently specific. *International Longshoremen's Association, Local 1291 v. Philadelphia Marine Trade Association*, 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967). The standards cited by the prisoners in the November 1 order are too vague to support a contempt motion. They include such requirements as a "systematic" program for screening and evaluation, participation of "sufficient" numbers of mental health professionals, and implementation of a "basic" program for identifying, treating, and supervising suicidal prisoners. *See Balla I*, 595 F.Supp. at 1577–78. These terms are too general to be enforced through a contempt motion.

By challenging, through a contempt motion, the sufficiency of the plans adopted July 11 in light of the November 1 principles, the prisoners were in fact challenging the basis of the July 11 order itself. Yet, it is well settled that "a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy." *United States v. Rylander*, 460 U.S. 752, 756, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983), *quoting Maggio v. Zeitz*, 333 U.S. 56, 69, 68 S.Ct. 401, 408, 92 L.Ed. 476 (1948). To challenge whether the plans adopted by the court satisfied the six standards articulated in the November 1 opinion, the prisoners could have either appealed the July 11 order once it became final, or attempted to reopen testimony in the compliance hearings. They did neither.

### B.

Having determined that the district court properly judged the Board's compliance against the July 11 order, we must now

assess the prisoners' argument that the court abused its discretion by denying their motion for contempt.

 As we have previously stated, civil contempt is appropriate when a party fails to comply with a specific and definite court order. *Gifford,* 741 F.2d at 265. Failure to comply consists of not taking "all the reasonable steps within [one's] power to insure compliance with the order[ ]." *Sekaquaptewa v. MacDonald,* 544 F.2d 396, 406 (9th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977). The proof for civil contempt must be clear and convincing—a higher standard than the preponderance of the evidence standard but less stringent than beyond a reasonable doubt. *United States v. Powers,* 629 F.2d 619, 626 n. 6 (9th Cir.1980) (dictum). Substantial compliance with a court order is a defense to an action for civil contempt. *Donallco,* 787 F.2d at 1379.

 Applying these principles, we hold that the district judge did not abuse his discretion. The psychiatric care plan adopted on July 11, 1985, by the court is embodied in a letter from Ralph Pierce, the Deputy Warden of Programs, to Idaho's Deputy Attorney General. After describing the mental health program's staffing, the letter proposes (1) to add four more hours of psychiatric coverage per week, and (2) to hire two more psychologists, "one of whom will be an Idaho State licensed Ph.D." In its order denying the prisoners' contempt motion, the district court found that the "testimony is uncontradicted that four additional hours of psychiatrists' time have been added and. that two additional psychologists have been hired by the Department." Because, as we hold later, no sex offender treatment program was required, the Board could not properly have been held in contempt of that portion of the order. Since the Board has otherwise complied fully with the July 11 order, it is clear that there was no abuse of discretion in denying the prisoners' contempt motion.

## C.

The prisoners also argue that the district court erred in denying their motion for reconsideration. Because we hold that the prisoners' motion for reconsideration was improperly brought under Rule 59(e), we need not reach the merits of the issue.

The prisoners' motion for reconsideration, filed on August 27, 1986, requested that the district court alter or amend its judgment of August 18, 1986, "pursuant to Rule 59 of the Federal Rules of Civil Procedure." The August 18 order had denied the prisoners' motion for contempt and closed to relitigation all issues except overcrowding. In a brief accompanying their motion for reconsideration, the prisoners advanced two grounds for reconsideration. First, they argued that the Board's plans were insufficient because they did not satisfy the six constitutional minima contained in the November 1 decision. The prisoners therefore requested that "a new remedial plan ... be constructed." Second, the prisoners argued that the Board had not complied with the plans adopted on July 11.

Rule 59(e) provides: "A motion to alter or amend *the judgment* shall be served not later than 10 days after entry of the judgment." Fed.R.Civ.P. 59(e) (emphasis added). Rule 59(e) "clearly contemplates entry of judgment as a predicate to any motion." *Stephenson v. Calpine Conifers II, Ltd.,* 652 F.2d 808, 812 (9th Cir.1981) (*Stephenson* ), *overruled in part on other grounds, In re Washington Public Power Supply System Securities Litigation,* 823 F.2d 1349, 1350–52, 1358 (9th Cir.1987) (en banc); *see also* 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2651 (2d ed. 1983).

 The word "judgment" as used in the Federal Rules of Civil Procedure is defined in Rule 54(a). *See Financial Services Corp. v. Weindruch,* 764 F.2d 197, 198 (7th Cir.1985) (per curiam) (*Weindruch*); 10 C. Wright, A. Miller & M. Kane, *supra.* A judgment "includes a decree and any order from which an appeal lies." Fed.R.Civ.P. 54(a). Thus, the word "judgment" encompasses final judgments and appealable interlocutory orders. *See Wein-*

*druch,* 764 F.2d at 198; *Morgan Guaranty Trust Co. v. Third National Bank of Hampden County,* 545 F.2d 758, 760 (1st Cir.1976).

As we stated in *Stephenson,* the requirement of a judgment as a prerequisite to moving for reconsideration under Rule 59(e) protects against the specter of piecemeal review. *Stephenson,* 652 F.2d at 812. This is so because the denial of a Rule 59(e) motion is itself a final, appealable judgment. *Walker,* 268 F.2d at 25. In *Stephenson,* we observed that "were we to permit Rule 59(e) motions without entry of judgment, litigants could obtain appellate review of partial judgments by simply appealing a Rule 59(e) order, completely bypassing the requirements of Rule 54(b) and 28 U.S.C. § 1291." 652 F.2d at 812.

■ The prisoners' first ground for reconsideration in their August 27 motion in effect challenged the court's July 11 order, which had adopted the Board's plans as adequate to meet the constitutional minima articulated in *Balla I.* For purposes of this appeal, we assume without deciding that the district court's July 11 order was an appealable order under 28 U.S.C. § 1292(a)(1) and, as such, a "judgment" properly challengeable through a Rule 59(e) motion for reconsideration. *See id.* Yet to challenge the July 11 order under Rule 59(e), the prisoners would have had to serve their motion within ten days of the entry of that order. Fed.R.Civ.P. 59(e). They failed to do so. For this reason, their motion was untimely and, therefore the district court did not abuse its discretion in refusing to reopen the matter. *See Scott v. Younger,* 739 F.2d 1464, 1467 (9th Cir. 1984) (untimely Rule 59(e) motion properly denied by district court).

■ In their August 27 motion for reconsideration, the prisoners also requested the district judge to reconsider his August 18 denial of their motion for contempt. While this aspect of their Rule 59(e) motion *was* timely, we do not believe that the August 18 order was a "judgment" within the meaning of Rule 59(e). The August 18 order did not "end[ ] the litigation on the merits and leave[ ] nothing for the court to do but execute the judgment." *Coopers &*

*Lybrand,* 437 U.S. at 467, 98 S.Ct. at 2457, quoting *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945) (*Catlin*). Nor is it an interlocutory order for which appeal is authorized under 28 U.S.C. § 1292 or Fed.R.Civ.P. 54(b). Thus, the issue of whether the district court abused its discretion when it refused to reconsider its August 18 order under the authority of Rule 59(e) is not before us.

For the foregoing reasons, we affirm the district court's denial of the prisoners' motions for contempt and reconsideration.

## III

We turn now to the Board's cross-appeal challenging the required program for sex offenders and the failure to allow additional time to comply with prison population requirements.

### A.

In *Balla I,* the district court ruled as a matter of law that Idaho Code § 20–223 required the Board to establish a treatment program for sex offenders. *Balla I,* 595 F.Supp. at 1578. The Board now challenges that ruling. In response, the prisoners first argue that it is now too late for the Board to appeal the district court's decision. The prisoners claim that the *Balla I* decision was final because it "end[ed] the litigation on the merits and [left] nothing for the court to do but execute the judgment." *Coopers & Lybrand,* 437 U.S. at 467, 98 S.Ct. at 2457, *quoting Catlin,* 324 U.S. at 233, 65 S.Ct. at 633. According to the prisoners, because the *Balla I* order was final on November 1, 1984, the Board had to appeal it within the time limits set by Federal Rule of Appellate Procedure 4.

■ The *Balla I* decision, while determining that the prisoners were entitled to relief, left the nature and extent of relief to be determined later. "An order adjudging liability but leaving the quantum of relief still to be determined has been a classic example of non-finality and non-appealability from the time of Chief Justice Marshall to our own." *Taylor,* 288 F.2d at 602. Nor did *Balla I* settle all the issues as to

all the parties. *See Coopers & Lybrand,* 437 U.S. at 467, 98 S.Ct. at 2457. The overcrowding issue was not resolved until *Balla II.* The *Balla I* decision was therefore not a final judgment. Nor was the court's August 18, 1986, order, which closed to relitigation all issues except overcrowding, a final judgment. Only the court's March 25, 1987, opinion constituted a final judgment, since only then were all issues resolved. *See Balla II.*

▮ Following *Balla II,* the Board filed a proper motion for reconsideration under Rule 59. As required, the motion was served within 10 days of *Balla II.* This timely motion suspended the deadline for filing a notice of appeal. Fed.R.App.P. 4(a)(4). On May 20, 1987, the district court issued an order granting in part and denying in part the Board's motion for reconsideration. The Board has timely appealed from *Balla II* after the filing of this order.

▮ Our opinion does not foreclose litigants from seeking interlocutory appeals of injunctions under 28 U.S.C. § 1292(a), or permissive interlocutory appeals under 28 U.S.C. § 1292(b). These options can be exercised before all issues as to all parties have been resolved. Nor are litigants foreclosed from seeking appeals from judgments properly certified under Federal Rule of Civil Procedure 54(b). But when no such appeal is taken from an interlocutory order, "the interlocutory order merges in the final judgment and may be challenged in an appeal from that judgment." *Baldwin v. Redwood City,* 540 F.2d 1360, 1364 (9th Cir.1976) (footnote omitted), *cert. denied,* 431 U.S. 913, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977).

Turning to the merits, we must now consider whether section 20–223 of the Idaho Code requires Idaho to establish a psychological treatment program for sex offenders. We review this legal question independently. *McConney,* 728 F.2d at 1201.

Section 20–223, Idaho's parole statute, provides in part:

 (b) No person serving a sentence for rape, incest, committing a lewd act upon a child, crime against nature, or with an intent or an assault with intent to commit any of the said crimes or whose history and conduct indicate to the commission that he is a sexually dangerous person, shall be released on parole except upon the examination and evaluation of one or more psychiatrists or psychologists to be selected by the commission and such evaluation shall be duly considered by the commission in making its parole determination. The commission may, in its discretion, likewise require a similar examination and evaluation for persons serving sentences for crimes other than those above enumerated.

 . . .

 (c) Before considering the parole of any prisoner, the commission shall afford the prisoner the opportunity to be interviewed. A parole shall be ordered only for the best interests of society when the commission reasonably believes that the prisoner no longer poses a threat to the safety of society, not as a reward of clemency and it shall not be considered to be a reduction of sentence or a pardon. A prisoner shall be placed on parole only when arrangements have been made for his employment or maintenance and care, and when the commission believes the prisoner is able and willing to fulfill the obligations of a law-abiding citizen.

Idaho Code § 20–223. The district court determined that under *Ohlinger v. Watson,* 652 F.2d 775 (9th Cir.1980) (*Ohlinger*), Idaho was required to provide psychological treatment for sex offenders. *Balla I,* 595 F.Supp. at 1569, 1578. The district court's decision turned on the statute's purported rehabilitative purpose. *Id.* The Board contends that the district court misapplied *Ohlinger* because the Idaho statutory sentencing structure differs significantly from the Oregon scheme before our court in *Ohlinger.*

At the time Ohlinger was sentenced, Oregon had a separate sentencing scheme for "sex offenders." Oregon courts had discretion to sentence persons convicted of certain enumerated sex crimes either to (1) the determinate sentence for the specific offense, or (2) an indeterminate life sentence as a "sex offender." *Ohlinger,* 652 F.2d at 776–77 & n. 2. To invoke the sex

offender option, however, the court had to find that (1) the offense involved a child under 16 years of age, and (2) the defendant "had a mental or emotional disturbance, deficiency, or condition" which predisposed the defendant to the commission of various sex crimes and thus posed a threat to others. *Id.* at 776 n. 2. Because sex offenders sentenced to indeterminate life terms could be released only after being found psychologically healthy, they could serve lifetime sentences if their mental health did not improve. *Id.* at 778.

In *Ohlinger,* we narrowly held that sex offenders sentenced under Oregon's unique statutory scheme had a constitutional right to such individual treatment as would give each of them a realistic opportunity to be cured or to improve his or her mental condition. *Id.* at 778–79. Crucial to this holding was our conclusion that the defendants "were not given indeterminate life sentences merely because they committed criminal offenses, but also because they possessed 'a mental disturbance, delinquency [sic] or condition predisposing' them to the commission of sex offenses." *Id.* at 777, *quoting* Or.Rev.Stat. § 137.111 (repealed 1971). Because Oregon had chosen "to *incarcerate* [sex offenders] *on the basis of their mental illness,*" it "no longer ha[d] an interest in punishing appellants, but rather in attempting to rehabilitate them." *Id.* (emphasis added).

Stressing the statute's underlying rehabilitative rationale, we analogized the treatment of Oregon sex offenders to that of persons committed civilly for mental illness. *Id.* at 778 n. 8. In drawing this analogy, we stressed the substitution of indeterminate life sentences for the maximum determinate sentence under the Oregon scheme. *Id.* We concluded that persons sentenced under this sex offenders scheme were entitled to the constitutional minimum level of treatment required for sex offenders committed civilly. *Id.* at 777 n. 5.

█ Our decision in *Ohlinger* hinged upon factors which are absent here. First, incarceration of sex offenders in Idaho may not extend past the maximum term provided for each crime, although judges do possess considerable latitude in setting the sentence. Second, Idaho does not sentence sex offenders on the basis of mental conditions which predispose them to commit sex offenses. Rather, Idaho sex offenders are sentenced solely for the commission of crimes. *See Ohlinger,* 652 F.2d at 777. Put differently, Idaho's purpose in sentencing is punitive and not rehabilitative. *State v. Gee,* 107 Idaho 991, 695 P.2d 376, 379 (1985) (*Gee*) ("[T]he provisions of [Idaho Code] § 20–223 apply to Gee not because of his mental or physical status but because he committed one of the enumerated offenses, namely rape."). As the Idaho Supreme Court held in *Gee,* section 20–223 "does not enhance a parolee's sentence or otherwise inflict punishment. Rather, section 20–223 bears a reasonable relationship to the proper state purpose of ensuring that prisoners released on parole will be likely to successfully serve the remainder of their sentences out of the physical custody of the Board of Corrections." *Id.* Thus, the "rehabilitative rationale" underlying the Oregon scheme is not equally applicable to Idaho Code § 20–223.

Idaho conducts psychological examinations of sex offenders for parole purposes only. Section 20–223(b) requires that a sex offender submit to such an examination before being considered for parole. Idaho Code § 20–223(b). The Parole Commission (Commission) may require a similar examination, however, for any non-sex offender prisoner. *Id.* The Commission is only required to "duly consider" the evaluation. Thus, section 20–223 does not establish any entitlement to parole. *Gee,* 695 P.2d at 379 ("[Idaho Code] § 20–223 does not dictate that the Board of Corrections deny parole to any individual nor does it require that the Board follow the psychiatrist's recommendation, if any."); *Vittone v. State,* 114 Idaho 618, 759 P.2d 909, 910–11 (Ct.App. 1988); *Izatt v. State,* 104 Idaho 597, 661 P.2d 763, 765–66 (1983) (*Izatt*). In Idaho, parole is a matter of grace. *Izatt,* 661 P.2d at 766. *Compare Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 2419–22, 96 L.Ed.2d 303 (1987) (Montana parole statute which uses mandatory language to

create a presumption of release once certain conditions are met creates a liberty interest protectible under due process clause); *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 11–12, 99 S.Ct. 2100, 2105–06, 60 L.Ed.2d 668 (1979) (because it contains mandatory language, Nebraska parole statute creates "expectancy of release" which is a liberty interest implicating due process rights).

In *Hoptowit v. Ray,* 682 F.2d 1237 (9th Cir.1982) (*Hoptowit* ), we discussed the applicability of *Ohlinger* to prisoners serving criminal sentences:

> We have recently held that persons committed for mental incapacity have a constitutional right to adequate rehabilitative treatment. [*Ohlinger,* 652 F.2d at 778–79]. The rationale of *Ohlinger* does not extend to those serving criminal sentences. Indeed, *Ohlinger* supports the proposition that those serving criminal sentences have no constitutional right to rehabilitation. In *Ohlinger,* the prisoners "could be held indefinitely as a result of their mental illness, while those convicted and sentenced under the State [criminal law] need only serve the ... maximum term." *Id.* at 779. Incarceration for criminal offenses "is primarily for punitive purposes. Although rehabilitation may be desirable, it is not necessarily the primary function of such incarceration." *Id.* at 778.

*Hoptowit,* 682 F.2d at 1255 n. 8. We conclude that this language determines the outcome of this case. Since Idaho sex offenders are serving criminal sentences, the rationale of *Ohlinger* does not extend to them.

The prisoners argue, however, that almost all of Idaho's sex offenders are punishable by up to life imprisonment. In addition, the prisoners assert that "scores of the plaintiff class" have been sentenced to life imprisonment under these statutes. This argument lacks merit. The specific crimes listed in section 20–223(b) are: rape, Idaho Code § 18–6104; incest, Idaho Code § 18–6602; committing a lewd act upon a child, Idaho Code §§ 18–1506 & 18–1508; crime against nature, Idaho Code

§ 18–6605; and assault with intent to commit any of the foregoing, Idaho Code §§ 18–909, 18–910. Two of these five crimes—incest and assault with intent to commit a predicate offense—are punishable by not more than 10 years' confinement. *See* Idaho Code §§ 18–910, 18–6602. More importantly, the prisoners have pointed to no evidence in the record to support their assertion that a significant or disproportionate number of class members or Idaho sex offenders generally have received indeterminate life sentences.

Lastly, the prisoners argue that even if *Ohlinger* 's reasoning does not require Idaho to establish a special care program for sex offenders, the absence of such a program for sex offenders violates the eighth amendment. This argument was not raised in the district court. The prisoners did raise a general eighth amendment challenge to medical and psychiatric care in the prison, and the district court ruled in the prisoners' favor on this claim, ordering the Board to implement a plan to improve those services. Because no eighth amendment challenge to the absence of a sex offender treatment program was made before the district court, we need not address that argument here.

We therefore reverse the district court's legal conclusion that under *Ohlinger,* section 20–223 requires Idaho to establish a special psychological treatment program for sex offenders.

### B.

The Board also challenges the district court's refusal to extend its time to comply with a population cap in Unit 9. The Board challenged the deadline through a Rule 59(e) motion for reconsideration, which was granted in part and denied in part. The Board appeals from the denial of this motion. We review the denial of a proper motion for reconsideration for abuse of discretion. *Coastal Transfer,* 833 F.2d at 211.

▪ Both parties mistakenly assume that our review is governed by the special abuse of discretion standard articulated in *Toussaint v. McCarthy,* 801 F.2d 1080,

1087–89 (9th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). In *McCarthy,* we held that in cases involving structural litigation, where "the scope of injunctive relief" is being challenged, *id.* at 1086–87, we must "scrutinize the injunction closely to make sure that the remedy protects the plaintiffs' constitutional rights and does not require more of state officials than is necessary to ensure their compliance with the constitution." *Id.* at 1089. Here, the Board appeals on this issue only from the denial of its Rule 59(e) motion for reconsideration. Both *McCarthy* and the only subsequent case to apply its standard, *Gary H. v. Hegstrom,* 831 F.2d 1430, 1432–33 (9th Cir.1987), involved *direct* appeals of permanent injunctions. Because of the difference in procedural posture in this case, our review is properly governed by *Coastal Transfer.*

The Board does not contest the holding that unconstitutional conditions will persist if Unit 9 remains double celled. It argues, however, that in light of its compliance with the district court's injunction elsewhere throughout the prison, it should be allowed to double cell the Unit 9 "close custody" inmates as long as their "basic needs" are met. We assume under the facts of this case that this would fall short of the minimum required by the Constitution, since the Board admits that continued double celling in Unit 9 would violate the eighth amendment. The Board claims that the district court's ordered remedy requires more than is possible, because the new facility for high-risk prisoners such as those presently double celled in Unit 9 is not yet complete. The Board points to its accelerated efforts to provide additional space, and cites May 1989 as the earliest date for completion.

▮ We hold that the district judge did not abuse his discretion. The prison was designed to hold 495 prisoners. On January 7, 1987, the prison's population was 741. Technically, it may be said that the prison is 50% "overcrowded," but this fact has no constitutional significance standing alone. *Toussaint v. Yockey,* 722 F.2d 1490, 1492 (9th Cir.1984), *citing Rhodes v.* *Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (*Rhodes*). Only when overcrowding is combined with other factors such as violence or inadequate staffing does overcrowding rise to an eighth amendment violation. *Hoptowit,* 682 F.2d at 1246–49.

In *Balla I,* the district court did not base any of its findings of unconstitutionality on prison overcrowding, although even then there "seemed to be little question but that [the prison] [was] overcrowded." *Balla I,* 595 F.Supp. at 1573. The court observed that "overcrowding clearly brings on many problems, including idleness, frustration, stress, discomfort, edginess, and fear. . . . [and] it is one of the principal causes of the effect of violence, fights, stabbings, and of course, extreme management problems." *Id.* However, the court determined "that a real effort [was] being made to alleviate the overcrowding." *Id.* As the court later explained in *Balla II:*

> In *Balla [I],* the court did not explicitly find, in terms of numbers of inmates, unconstitutional overcrowding at [the prison]. In fact, this court, based upon [the Board's] testimony heard in March of 1984, felt the obvious overcrowding at [the prison] would in all likelihood be alleviated by giving the Board of Corrections a little time to develop some of their announced plans. . . . Thus, the court in its original decision sidestepped the issue of overcrowding for another day.

*Balla II,* 656 F.Supp. at 1109. Almost a year after *Balla I,* however, the overcrowding and its concomitant problems remained. Consequently, the prisoners initiated further proceedings. At their behest, the court agreed to make "a determination regarding overcrowding at [the prison] as a specific condition of confinement." *Id.* at 1110.

The district court appointed an expert witness to assist in making this determination. *Id.* Applying the standards announced in *Rhodes,* 452 U.S. 337, 101 S.Ct. 2392, the expert recommended that the prison reduce its population by 58 prisoners, from 741 to 683. The expert specifical-

ly recommended that the population of Unit 9, which houses inmates in close custody, be reduced from 101 prisoners to 78, and that five other living units be reduced in population as well. Regarding Unit 9, the expert concluded: "Because there is a strong potential for violent behavior among this classification of inmate [close custody], no more than one inmate should be housed in a cell."

In addition to receiving the expert's recommendation, the court held two hearings on the issue of overcrowding, one in 1985 and a second in 1987. *Balla II*, 656 F.Supp. at 1110. The district judge himself made a tour of the prison on February 12, 1987. *Id.* The district court in *Balla II* adopted virtually in full the expert's recommendations regarding population. Rendering its decision on March 25, 1987, the court gave the Board until July 1, 1987 (approximately 100 days) to reduce the inmate population in six of the prison's living units to certain specified levels, including a total decrease of 23 inmates in Unit 9. *Id.* at 1113–14, 1117, 1119–20.

On April 3, 1987, the Board filed a motion to alter or amend the judgment under Rule 59. It requested more time in which to reduce the population of three of these six units. This request was granted with respect to two of these units, but with respect to Unit 9, the request was granted only in part. The district court refused to allow the Board to maintain an admittedly unconstitutional level of overcrowding in Unit 9 for an additional two years. Therefore, the district court granted only a four-month extension, to November 1, 1987. Altogether, then, the district court granted the prison over seven months to comply with its original order eliminating double celling in Unit 9.

From the foregoing it is clear that the district judge did not abuse his discretion in denying the Board the full extension of time requested. Only after patiently exhausting other alternatives did the district court conclude that single celling in Unit 9 was required to protect the prisoners' constitutional right to personal safety. The district court afforded the Board an oppor-

tunity to raise Unit 9 to constitutional minima through means other than new construction—for example, through circumscribing movement in certain tiers. *See Balla I*, 595 F.Supp. at 1579. After years of involvement, the district court has concluded that no arrangement which involves double celling Unit 9 can meet constitutional minima. It is undisputed that double celling in Unit 9 poses serious risks of violence and sexual attack to its inhabitants. *Balla II*, 656 F.Supp. at 1117; *Balla I*, 595 F.Supp. at 1573, 1579.

Moreover, the Board has known for years that double celling in Unit 9 leads to violence and sexual assaults, and yet it has permitted this situation to continue. *See Balla I*, 595 F.Supp. at 1579 ("[P]rison officials themselves have acknowledged the problems [of violence and sexual assaults] inherent in double-celling close custody inmates at [the prison]."). In ordering the Board to single-cell Unit 9, the district court stated: "Of particular concern to this court was the *historical failure* in the operation of [the prison] to meet constitutional minima in the housing of high-security and close custody inmates." *Balla II*, 656 F.Supp. at 1109 (emphasis added). Evidence of an historical failure to comply with constitutional standards is highly relevant in fashioning an effective remedy. *Hutto v. Finney*, 437 U.S. 678, 687, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978). The Board's inaction in the face of this obvious problem supported the district court's refusal to grant the full extension of time.

Nor does the presence of various factors weighing in the Board's favor alter our conclusion that the district judge did not abuse his discretion in denying the Board's motion for reconsideration. In evaluating these factors, we can be assisted by considering analogous case law. Although not controlling, cases denying Rule 60(b) motions to modify injunctions in structural litigation cases provide useful analysis.

The Board's good faith in accelerating construction of the new facility is significant. *See Cody v. Hillard*, 830 F.2d 912, 915 (8th Cir.1987) (en banc) (denial of pris-

on officials' Rule 60(b) motion reversed where officials acted in good faith and prison conditions did not violate the Constitution), *cert. denied,* — U.S. ——, 108 S.Ct. 1078, 99 L.Ed.2d 237 (1988); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, *whether that conduct occurs in connection with establishing conditions of confinement* ... or restoring official control over a tumultuous cell block.") (emphasis added) (emphasized language dictum). Yet such good faith efforts do not cure the constitutional violations occurring for years. *See Battle v. Anderson,* 564 F.2d 388, 400–03 (10th Cir. 1977) (*Battle* ).

The Board argues, however, that compliance with the injunction's deadline will result in security problems harmful to inmates' personal safety. In ordering a remedy, courts must consider "the effect on legitimate security needs of the prison." *Hoptowit,* 682 F.2d at 1247. The Board argues that single celling Unit 9 will increase the potential for violence, disruptive behavior, and injuries to inmates and staff, because "close custody" inmates, ordinarily housed in Unit 9, will have to be placed in single cells in Unit 11. Unit 11 presently houses "medium custody" inmates. Unlike Unit 9, it has no toilets in cells and lacks remote locking doors. While Unit 9 was designed for close custody inmates, and can be locked down in a disturbance, Unit 11 lacks a lockdown capability. While we are not unsympathetic to these potential risks, we do not believe that the district judge abused his discretion in determining that they do not justify the continued violation of eighth amendment rights of Unit 9 inmates. This is particularly true because these risks are partly the result of the Board's own inaction. *See Battle,* 564 F.2d at 403 (rejecting argument that potential risks involved in placing violent and passive inmates in close proximity to reduce overcrowding elsewhere required reversal of district court's injunction). We therefore hold that the district judge did not abuse

his discretion in denying in part the Board's Rule 59(e) motion.

AFFIRMED IN PART; REVERSED IN PART.